586 A.2d 62

August BELLANCA, et ux.

v.

**COUNTY COMMISSIONERS OF KENT COUNTY, Maryland, et al.**

No. 472, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Feb. 28, 1991.

C. Daniel Saunders (Cristina Harding Landskroener, on the brief), Chestertown, for appellants.

George E.H. Gay, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Thomas A. Deming and Marianne D. Mason, Asst. Attys., Gen., on the brief), Annapolis, for appellees.

Argued before WILNER, C.J., and BISHOP and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

This appeal by August and Elettra Bellanca, appellants, from the judgment of the Circuit Court for Kent County affirming the Board of County Commissioner's denial of their application for a zoning map amendment presents two questions:

1. The Chesapeake Bay Critical Area Protection program provides for action by both the local jurisdiction and the State Critical Area Commission on all local program amendments. In the event of disagreement between those two bodies, which one enjoys the presumption of correction upon review?

2. Was the decision of the Kent County Commissioners to include the Bellanca property in the adjacent Limited Development Area consistent with the law, supported by the facts, not arbitrary or capricious, and therefore not susceptible of disapproval by the Critical Areas [sic] Commission?

We will affirm the judgment of the circuit court, *albeit* on a ground different from that relied upon by that court.

Before setting out the facts pertinent to the resolution of this case, it is necessary to review briefly the statutory scheme out of which this controversy has arisen. In 1984, the Maryland General Assembly enacted Chapter 794, Laws of 1984, entitled the "Chesapeake Bay Critical Area Protection Program" and which is codified in Maryland Natural

Resources Code Ann., §§ 8–1801–1816.[1] Its purposes, as enunciated by the General Assembly, are twofold:

(1) To establish a Resource Protection Program for the Chesapeake Bay and its tributaries by fostering more sensitive development activity for certain shoreline areas so as to minimize damage to water quality and natural habitats; and

(2) To implement the Resource Protection Program on a cooperative basis between the State and affected local governments, with local governments establishing and implementing their programs in a consistent and uniform manner subject to State criteria and oversight.

§ 8–1801(b).

To achieve these purposes, the Chesapeake Bay Critical Area Commission (the "Commission") was created. Although the legislative intent in enacting the legislation was "that each local jurisdiction shall have primary responsibility for developing and implementing a program," [2] § 8–1808(a), it was to do so subject to review and approval by the Commission," *id.*, and the responsibility for the "adopt[ion] by regulation on or before December 1, 1985 [of the] criteria for program development and approval, which are necessary or appropriate to achieve the standards stated in subsection (b)[3] of this section", was given to the Commission. § 8–1808(d).

---

1. All citations that follow will be to the Natural Resources Article, unless otherwise indicated.

2. "Program" is defined in § 8–1802(a)(9)(i) & (ii), as "the critical area protection program of a local jurisdiction," including any amendments to it.

3. Subsection (b) enumerates the goals of the program, namely: "A program shall consist of those elements which are necessary or appropriate:
(1) To minimize adverse impacts on water quality that result from pollutants that are discharged from structures or conveyances or that have run off from surrounding lands;
(2) To conserve fish, wildlife, and plant habitat; and
(3) To establish land use policies for development in the Chesapeake Bay Critical Area which accommodate growth and also

Section 8–1809 addresses the approval and adoption of local critical area protection programs. Subsection (a) requires each local jurisdiction to advise the Commission in writing whether it intends to develop a critical area protection program. Should a local jurisdiction decide not to adopt a program, subsection (b) permits the Commission both to prepare and to adopt one for that local jurisdiction. In the event that the local jurisdiction decides to develop a program, it is required, by subsection (c), to submit to the Commission, on a time schedule and following procedures not at issue on this appeal, the program it has developed.

In addition to the minimum elements prescribed in § 8–1808(c), a local jurisdiction's Critical Area Protection Program must contain "a designation of those portions of the Chesapeake Bay Critical Area proposed for exclusion under paragraph (1) of this subsection, together with all factual information and expert opinion supporting its findings under this subsection." § 8–1807(b)(2).[4]

Within 30 days of receipt of a program submitted by a local jurisdiction for approval, the Commission must appoint a panel of five of its members to conduct a public hearing in the affected jurisdiction. § 8–1809(d)(1). Within 90 days of receipt, it must either approve the proposed program or notify the local jurisdiction of specific changes it will require before approving it, otherwise the program shall be deemed approved. § 8–1809(d)(2).[5] When a local jurisdiction has designated portions of the initial planning area to

---

address the fact that, even if pollution is controlled, the number, movement, and activities of persons in that area can create adverse environmental impacts.

4. Under § 8–1807(a), the Legislature set forth the "initial planning area for determination of the Chesapeake Bay Critical Area." Each local jurisdiction, pursuant to subsection (b), is permitted to exclude, based upon certain findings required to be made by it, portions of that initial planning area.

5. Subsection (d)(3) sets out the procedure to be followed should it be necessary to make changes in the initial program proposal, an issue that is not before us on this appeal.

be excluded from the critical area, that designation shall be approved:

unless the Commission finds, based on stated reasons, that the decision of the local jurisdiction was:

(i) Not supported by competent and material evidence; or

(ii) Arbitrary or capricious.

§ 8–1807(a)(3). The Commission must approve a local jurisdiction's program, including any amendments, if it is in compliance with:

(1) The standards set forth in § 8–1808(b)(1) through (3) of this subtitle; and

(2) The criteria adopted by the Commission under § 8–1808 of this subtitle.

Section 8–1809(i). A local jurisdiction has 90 days from the date the Commission approves its program to adopt it in accordance with the "legislative procedures for enacting ordinances" in that jurisdiction. § 8–1809(e).

Following the Commission's approval of the Kent County, Critical Area Protection program, the Board of County Commissioners enacted the Kent County Critical Area Ordinance. To assist it in classifying the land in the Critical Area, the Board developed, and adopted, "mapping rules," which it utilized in the comprehensive rezoning process. One of those rules, specifically, "lots of 20 acres or more are always RCA [Resource Conservation Area]" was applied to appellants' property. Thus, the subject 57 ± acres owned by appellants were placed in the Resource Conservation Area. The contiguous and adjacent subdivision, Shorewood Estates, originally developed by appellant August Bellanca, and of which the subject property was initially a part was included in the Limited Development Area.[6]

---

6. The parties inform us that the actual terms used in the Kent County Ordinance are "Resource Conservation District and Critical Area Residential District." They concede that these terms are the equivalent of the terms used by the Commission in the regulations it promulgated. We will use the terms used in the regulations.

Before the Kent County program was submitted to it for approval, the Commission had promulgated regulations, pursuant to § 8–1808(d), in which it proposed criteria "for directing, managing, and controlling development (e.g., residential, commercial, industrial and related facilities) so that the adverse impacts of growth in the Critical Area are minimized." Code of Maryland Regulations (COMAR) 14.-15.02.01. To recognize existing land uses and development in the critical area and to control future uses and development in that area, the regulations recognized three types of development areas: (1) Intensely Developed Areas; (2) Limited Development Areas; and (3) Resource Conservation Areas. 14.15.02.02A. As to each, criteria designed to guide the local jurisdictions in classifying the land in the critical area and policies to be followed by the local jurisdictions when addressing one of the areas were developed and codified. Relevant to our inquiry is the Commission's definition of the Resource Conservation and Limited Development Areas and the policies made applicable to them.

> The Commission defined Resource Conservation Areas as those areas characterized by nature-dominated environments (that is, wetlands, forests, abandoned fields) and resource-utilization activities (that is, agriculture, forestry, fisheries activities, or aquaculture). These areas shall have at least one of the following features:
>
> > (1) Density is less than one dwelling unit per 5 acres; or
> >
> > (2) Dominant land use is in agriculture, wetland, forest, barren land, surface water, or open space.

COMAR 14.15.02.05A. The policies to be advanced by Resource Conservation Areas, and required to be followed by local jurisdictions, are to:

> (1) Conserve, protect, and enhance the overall ecological values of the Critical Area, its biological productivity, and its diversity;
>
> (2) Provide adequate breeding, feeding, and wintering habitats for those wildlife populations that require the

Chesapeake Bay, its tributaries, or coastal habitats in order to sustain populations of those species;

(3) Conserve the land and water resource base that is necessary to maintain and support land uses such as agriculture, forestry, fisheries activities, and aquaculture; and

(4) Conserve the existing developed woodlands and forests for the water quality benefits that they provide.

COMAR 14.15.02.05B.

COMAR 14.15.02.04A, pertaining to Limited Development Areas, provides:

A. Limited Development Areas are those areas which are currently developed in low or moderate intensity uses. They also contain areas of natural plant and animal habitats, and the quality of runoff from these areas has not been substantially altered or impaired. These areas shall have at least one of the following features:

(1) Housing density ranging from one dwelling unit per 5 acres up to four dwelling units per acre;

(2) Areas not dominated by agriculture, wetland, forest, barren land, surface water, or open space;

(3) Areas meeting the conditions of Regulation .03A, but not .03B, above;

(4) Areas having public sewer or public water, or both.

The local jurisdiction, when addressing a Limited Development Area, is required to apply policies designed to:

(1) Maintain, or if possible, improve the quality of runoff and groundwater entering the Chesapeake Bay and its tributaries;

(2) Maintain, to the extent practicable, existing areas of natural habitat; and

(3) Accomodate additional low or moderate intensity development if:

(a) This development conforms to the water quality and habitat protection criteria in § C, below, and

(b) The overall intensity of development within the Limited Development Area is not increased beyond the

level established in a particular area so as to change its prevailing character as identified by density and land use currently established in the area.

COMAR 14.15.02.04B.

After the Kent County Critical Area Ordinance had been enacted, appellants filed an application for a zoning map amendment,[7] which would remove their property from the Resource Conservation Area and place it in the Limited Development Area. The rationale for the application was that the subject property comprised the remnants of the Shorewood Estates, which appellants developed, and that, as appellants desire to develop it in a consistent manner, the two properties should be considered together. Following a public hearing, at which appellants' position, and that of its opposition, were presented,[8] the Board approved their application.

The Board forwarded its approval of appellants' application, along with that of other applicants, to the Commission for its approval. In support of its action, the Board stated that the original RCA designation "is an error due to the character of the general area." In the attached "summary of reasoning for their approval", it advised the Commission:

> The Bellanca's own property on the Sassafras River outside of Galena. Since the early sixties, small parcels have been divided from the original farm. Approximately 150 acres remain in the farm. A forty-four acre field and two small acres are located in the Critical Area. Mr. Bellanca's subdivision, Shorewood Estates, and a large lot sub-

---

**7.** Appellants maintain that their application was filed after enactment of the Critical Area Ordinance at the request of the Board of County Commissioners. The minutes of the hearing at which the ordinance was adopted reflects that appellants had earlier filed, with the planning office, a request for amendment of the Critical Area program. They also reflect that "Mr. Bellanca agreed to withdraw his application and to resubmit it within sixty days for the first consideration of amendments."

**8.** Several other applications for amendments were considered at the same public hearing.

division Pleasant Cove adjoin the remaining farmland. Outside the Critical Area, the remaining land adjoins a large farm slated for subdivision.

On appeal, appellants argue, first, that "[t]he question which the Court must decide is not what standard of review to apply to the action of the decision maker, but *which entity* in the process *is* the decision maker to whom the standard of review applies." (Emphasis in original). Then, assuming that the appropriate decision maker is the Board of County Commissioners, they argue that its initial decision to amend the Critical Area ordinance by removing their property from the Resource Conservation Area and placing it in the Limited Development Area was supported by the facts and was not arbitrary or capricious. Therefore, they assert that the Commission was without authority to overrule that decision. Both arguments miss the point.

As we have seen, the Kent County program was submitted to the Commission for approval and that Commission did, indeed, approve it. It was only then that the Critical Area Ordinance adopting the program approved by the Commission, was enacted. Therefore, because it was so designated in the program, the Commission approved the classification of appellants' property in the Resource Conservation Area. There was, thus no disagreement between the Board and the Commission concerning the appropriateness of that designation. And no argument is made on this appeal that that initial classification or the Commission's adoption of it was erroneous or inappropriate. In other words, there is no contention that placement of the subject property in the Resource Conservation Area was inconsistent with the criteria and policies developed by the Legislature and implemented by the Commission. Moreover, the Commission, far from overruling or disapproving the decision of the County Commissioners on the issue critical to this appeal, actually joined with them in making that determination. That appellants sought an amendment of the program prior to its adoption which it withdrew before it

was acted upon, even if at the request of the Board, does not change that fact. Nor, for that matter, does the fact that, subsequently, the Board was persuaded by the position advanced by appellants in their application for amendment necessarily render the Board's initial decision, which was approved by the Commission, either erroneous or a mistake.

■ The critical question, then, is whether there was a mistake in the existing zoning. When the County Commissioners proposed to adopt appellants' amendment application, § 8–1809(h) provided: [9]

(h) *Program not to be amended without approval of Commission.*—A program may not be amended except with the approval of the Commission. Except for amendments developed during program review under subsection (g) of this section, an amendment to a zoning map may be granted by a local approving authority only on proof of a mistake in the existing zoning.

Thus, only if the initial determination that appellants' property was properly designated RCA was a mistake, and not simply a plausible interpretation of the existing circumstances, would the County Commissioners have been justi-

---

**9.** That section now provides:

(h) *Proposed program amendments and refinements.*—(1) As often as necessary but not more than 4 times per calendar year, each local jurisdiction may propose program amendments and program refinements to its adopted program.

(2)(i) *Except for program amendments or program refinements developed during program review under subsection (g) of this section, a zoning map amendment may be granted by a local approving authority only on proof of a mistake in the existing zoning.*

(ii) The requirement in paragraph 2)(i) of this subsection that a zoning map amendment may be granted only on proof of a mistake does not apply to proposed changes to a zoning map that:

1. Are wholly consistent with the land classifications in the adopted program; or

2. Propose the use of a part of the remaining growth allocation in accordance with the adopted program. (Emphasis added)

*See* Chapter 649, Laws of 1990, effective July 1, 1990.

fied in granting the amendment sought by appellants.[10] Put another way, the County Commissioners could approve appellants' application only if the evidence produced by appellants in support of their original amendment application was not only compelling, but was "strong evidence" that the classification was a mistake, *Trainer v. Lipchin,* 269 Md. 667, 672–73, 309 A.2d 471 (1973), *quoting Stratakis v. Beauchamp,* 268 Md. 643, 652–53, 304 A.2d 244 (1973), which was both "basic and actual" and made "at the time the property was zoned." *Hoy v. Boyd,* 42 Md.App. 527, 537, 401 A.2d 1047 (1979), *quoting Pattey v. Board of County Comm'rs,* 271 Md. 352, 361, 317 A.2d 142 (1974).

The Court of Appeals, in *Howard County v. Dorsey,* 292 Md. 351, 438 A.2d 1339 (1982) and this Court, in *Boyce v. Sembly,* 25 Md.App. 43, 334 A.2d 137 (1975), reached identical conclusions after considering the inherent nature of the terms "mistake" or "error":

> ... [T]he presumption of validity accorded to a comprehensive zoning is overcome and error or mistake is established when there is probative evidence to show that the assumptions or premises relied upon by the Council at the time of the comprehensive rezoning were invalid. Error can be established by showing that at the time of the comprehensive zoning the Council failed to take into account then existing facts, or projects or trends which

---

**10.** There is a question whether the Commission's disapproval of the County Commissioners' proposal to amend the Critical Area Ordinance is properly before us. The ruling that was appealed was the County Commissioners' determination, after advice from the Commission, that the requested amendment should be denied. And it was this determination which the circuit court upheld. Because the standard of review is whether there is any substantial evidence in the record to support the decision of the County Commissioners, our focus is on whether that decision is supported by the record. That is an entirely different question than whether the Commission improperly usurped the County Commissioners' function. But, whether we approach it from the perspective of what the County Commissioners ultimately did or from the perspective that they acted as they were required to do by the Commission, the result may really be the same. In either case, only in the event that there is compelling evidence of mistake in the existing zoning may we reverse the judgment of the circuit court.

were reasonably foreseeable of fruition in the future, so that the Council's action was premised initially on a misapprehension.... Error or mistake may also be established by showing that events occurring subsequent to the comprehensive zoning have proven that the Council's initial premises were incorrect.

\* \* \* \* \* \*

"It is presumed, as part of the presumption of validity accorded comprehensive zoning, that at the time of the adoption of the map the Council had before it and did, in fact, consider all of the relevant facts and circumstances then existing. Thus, in order to establish error based upon a failure to take existing facts or events reasonably foreseeable of fruition into account, it is necessary not only to show [1] *the facts that existed at the time of the comprehensive zoning but also [2] which, if any, of those facts were not actually considered by the Council.* This evidentiary burden can be accomplished by showing that specific physical facts were not readily visible or discernible at the time of the comprehensive zoning ...; by adducing testimony on the part of those preparing the plan that then existing facts were not taken into account ...; or by producing evidence that the Council failed to make any provision to accommodate a project, trend or need which it, itself, recognized as existing at the time of the comprehensive zoning.... (Emphasis in original, citations omitted)

*Dorsey,* 292 Md. at 356–58, 438 A.2d 1339, quoting *Boyce v. Sembly,* 25 Md.App. at 50–53, 334 A.2d 137.[11]

■ We believe the lower court was correct in affirming the County Commissioners' decision denying amendment of the Critical Area Ordinance as it relates to appellants'

---

11. Inasmuch as the amendment application was filed very shortly after the enactment of the Critical Area Ordinance, no issue was presented in this case of consequently occurring facts which demonstrate a mistake in the rezoning. *See Rockville v. Stone,* 271 Md. 655, 662, 319 A.2d 536 (1974). It is with these principles in mind that we address the issue of mistake on this record.

property. We are satisfied that there was no mistake in the existing zoning. As the record reflects, the County Commissioners adopted and applied the mapping rules, and more particularly as relates to this case, mapping rule no. 1. That Rule was also adopted by the Commission when it reviewed the Kent County program. Moreover, the conditions existing prior to the filing of the application for amendment were identical to those existing after its filing. And the argument made by appellants in support of amending the ordinance was available before the ordinance was enacted. Analyzing the classification given appellants' property in light of the applicable standards, criteria and policies developed by the Commission, but applied by the Board, reveals that it was appropriately classified. It fits very neatly within the criteria and policies applicable to Resource Conservation Areas. That a case could have been made for placing it in the Limited Development Area simply begs the question.

Moreover, it is not so clear that the County Commissioners determined that there had been a mistake in the classification of appellants' property in the sense that the term is used in subsection (h). It appears that the County Commissioners simply applied a different change of criteria to the classification of appellants' property than it employed in classifying other properties in the Critical Area.

■ Rather than argue the existence of mistake, appellants maintain that the Commission never explicitly determined that they failed to meet their burden in that regard and, perhaps, more important, they assert that, in any event, they need not have shown mistake because the ordinance was amended pursuant to a program review pursuant to § 8–1809(g).[12] In support of the latter position,

---

**12.** When the amendment was proposed, subsection (g) provided:

Each local jurisdiction shall review and propose any necessary, amendments to the local jurisdictions program, including local zoning maps, at least every 4 years. Amendments shall be sub-

they point out that, in the amendment process the County Commissioners considered seven map amendments and one text amendment.

We are not persuaded on either ground. As to the latter point, we think appellees' response is particularly appropriate:

> Nothing in the record supports this contention. The 7 proposed rezonings were for single parcels of property and were characterized by the County and based on "error" or "mistake". The submission came just months after program enactment, and addressed no changes in conditions or general intent of the Kent County program. Clearly, this is not a "program review" within the meaning of § 8–1809(g), for if program review is read to mean any grouping of several rezonings of individual properties, then the exception swallows the rule intended in § 8–1809(h).

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.

---

mitted to and acted on by the Commission in the same manner as the original program.

Effective July 1, 1990, it was amended to provide:

(g) *Review and proposed amendment of entire program.*—Each local jurisdiction shall review its entire program and propose any necessary amendments to its entire program, including local zoning maps, at least every 4 years beginning with the 4–year anniversary of the date that the program became effective and every 4 years after that date. Each local jurisdiction shall send in writing to the Commission, within 60 days after each 4–year anniversary, the following information:

(1) A statement certifying that the required review has been accomplished;

(2) Any necessary requests for program amendments, program refinements, or other matters that the local jurisdiction wishes the Commission to consider;

(3) An updated resource inventory; and

(4) A statement quantifying acreages within each land classification, the growth allocation used; and the growth allocation remaining.

*See* Chapter 649, Laws of 1990.