723 A.2d 440

**BUCKTAIL, LLC**

v.

**The COUNTY COUNCIL OF TALBOT COUNTY et al.**

**No. 38, Sept. Term, 1998.**

Court of Appeals of Maryland.

Jan. 27, 1999.

Richard A. DeTar (Miles & Stockbridge, P.C.), on brief, Easton, for appellant.

Michael L. Pullen, David R. Thompson (Brynja M. Booth, Cowdrey, Thompson & Karsten, P.A.; John White, all on brief), Easton, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

In this appeal a real estate developer contends that Talbot County (the County) erroneously denied its application for a growth allocation under the Chesapeake Bay Critical Area Protection Program. For the reasons set forth below we shall hold that there was procedural error that requires a remand to the Talbot County Council (the Council).

I

In 1984, the General Assembly enacted the Chesapeake Bay Critical Area Protection Program (the Program). Chapter 794 of the Acts of 1984, codified as amended in Maryland Code (1974, 1990 Repl.Vol., 1998 Cum.Supp.), §§ 8–1801 through 8–1817 of the Natural Resources Article (NR). The purposes of the Program are:

"(1) To establish a Resource Protection Program for the Chesapeake Bay and its tributaries by fostering more sensitive development activity for certain shoreline areas so as to minimize damage to water quality and natural habitats; and

"(2) To implement the Resource Protection Program on a cooperative basis between the State and affected local governments, with local governments establishing and implementing their programs in a consistent and uniform manner subject to State criteria and oversight."

*Id.* § 8–1801(b). The Chesapeake Bay critical area generally consists of the Chesapeake Bay, its tributaries to the head of tide, all designated State and private wetlands, and all land and water areas within 1,000 feet beyond the landward boundaries of designated State or private wetlands and the heads of tides of the Chesapeake Bay and its tributaries. *Id.* § 8–1807(a).

The General Assembly created the Chesapeake Bay Critical Area Commission (the Commission) to promulgate regulations and to administer the Program. *Id.* §§ 8–1803 and 8–1806. Each county within the critical area has primary responsibility for developing and implementing a local critical area protection program pursuant to criteria established by the Commis-

sion and subject to review and approval by the Commission. *Id.* §§ 8–1808(a), (d), and 8–1809. Each local program must designate the local critical area (the Critical Area), include a comprehensive zoning map for the Critical Area, and, as necessary, enact new or amended provisions of the jurisdiction's subdivision regulations, comprehensive or master plan, zoning ordinances or regulations, and enforcement provisions. *Id.* § 8–1808(c).

In 1986, the Commission promulgated regulations establishing the criteria for development in the Critical Area. Md. Regs.Code tit. 27, §§ 01.02.01 through 01.02.07 (1992) (COMAR). These regulations recognize three types of development areas: Intensely Developed Areas (IDAs), Limited Development Areas (LDAs), and Resource Conservation Areas (RCAs). COMAR § 27.01.02.02A. Local jurisdictions are directed to identify each of these three types of areas within their jurisdiction. COMAR § 27.01.02.02E.

The developer in the case before us seeks to have its Critical Area property reclassified under the County's program from RCA to LDA.

LDAs are defined as

"those areas which are currently developed in low or moderate intensity uses. They also contain areas of natural plant and animal habitats, and the quality of runoff from these areas has not been substantially altered or impaired. These areas shall have at least one of the following features:

"(1) Housing density ranging from one dwelling unit per 5 acres up to four dwelling units per acre;

"(2) Areas not dominated by agriculture, wetland, forest, barren land, surface water, or open space;

"(3) Areas meeting the conditions of [COMAR § 27.01.02].03A [defining IDAs], but not [COMAR § 27.01.02].03B [regarding the concentration of IDA features], of this regulation;

"(4) Areas having public sewer or public water, or both."
COMAR § 27.01.02.04A.

RCAs are defined as

"those areas characterized by nature-dominated environments (that is, wetlands, forests, abandoned fields) and resource-utilization activities (that is, agriculture, forestry, fisheries activities, or aquaculture). These areas shall have at least one of the following features:

"(1) Density is less than one dwelling unit per 5 acres; or

"(2) Dominant land use is in agriculture, wetland, forest, barren land, surface water, or open space."

COMAR § 27.01.02.05A.

In the County the Critical Area zones overlay the preexisting zoning.

Under the State statute the amount of growth of IDAs and LDAs allowed in each county's critical area is known as "growth allocation." NR § 8–1802(a)(4) (" 'Growth allocation' means the number of acres of land in the Chesapeake Bay Critical Area that a local jurisdiction may use to create new intensely developed areas and new limited development areas."). Each jurisdiction's growth allocation is limited to five percent of its RCA. NR § 8–1808.1(b); *accord* COMAR § 27.01.02.06A(1).

When locating new IDAs or LDAs local jurisdictions are mandated to follow six guidelines. They are

"(1) New intensely developed areas should be located in limited development areas or adjacent to existing intensely developed areas;

"(2) New limited development areas should be located adjacent to existing limited development areas or intensely developed areas;

"(3) No more than one half of the allocated expansion may be located in resource conservation areas;

"(4) New intensely developed areas and limited development areas should be located in order to minimize impacts to habitat protection areas as specified in COMAR 27.01.09

and in an area and in a manner that optimizes benefits to water quality;

"(5) New intensely developed areas should be located where they minimize their impacts to the defined land uses of the resource conservation area;

"(6) New intensely developed areas and limited development areas in the resource conservation area should be located at least 300 feet beyond the landward edge of tidal wetlands or tidal waters."

COMAR § 27.01.02.06B.

The County has some 600 miles of shoreline and approximately forty percent of the County is located within the Critical Area. Within this Critical Area, 51,000 acres are RCAs; thus, five percent or 2,554 acres are available for growth allocation. One-half of the 2,554 acres available for allocation has been set aside for growth in or around the towns of Easton, Oxford, and St. Michaels. In early 1997, when the County was considering the request for growth allocation involved in this case, 2,150 acres had not yet been allocated.

Growth allocation within the County is administered by the Council, pursuant to § 19.14(c)(1)(iv) of the Talbot County Zoning Ordinance (1991), as amended.[1] Under this subsection "a person with a committed financial, contractual, or proprietary interest" in property in the Critical Area can initiate a growth allocation district boundary amendment. § 19.14(c)(1)(iv)[a]. An application is filed in the County Planning Office, along with a proposed site plan or subdivision plat, or both, that meet the County's development design standards and site plan review requirements. § 19.14(c)(1)(iv)[b]; see §§ 19.10 (development design standards) and 19.12 (site plan review). The application "should make the maximum effort to meet the intent of the Critical Area policies and the applicable

---

1. Unless otherwise indicated, all statutory references are to the Talbot County Zoning Ordinance (1991), as amended.

design standards" and, specifically, should conform to the nine directives set forth below:

"[1] Create lots or parcels that maximize the opportunities for clustered development that protect habitat and agricultural resources;

"[2] Locate structures so as to minimize impact on habitat protection areas and agricultural areas;

"[3] Provide a minimally disturbed buffer along the shoreline;

"[4] Minimize soil erosion and runoff;

"[5] Maximize protection of eroding shorelines;

"[6] Have a minimal impact or cause an improvement to stormwater, floodplain and stream characteristics;

"[7] Minimize impacts on non-tidal wetlands;

"[8] Maximize protection of plant and wildlife habitats, particularly for threatened and endangered species, plant and wildlife common to the Chesapeake Bay Region, and anadromous fish propagation waters; and

"[9] Maximize protection of forests."

§ 19.14(c)(1)(iv)[b]. Recommendations of the Planning Officer and the Planning Commission are to be submitted to the Council within sixty days after the application is filed. § 19.14(c)(1)(iv)[c].

Whether the recommendations are to grant or to deny the application, the Council "shall introduce a bill (legislation) for the proposed amendment and hold a public hearing in order that interested parties and citizens shall have an opportunity to be heard." § 19.14(c)(1)(iv)[d]. The Council is required to keep "[a] complete record" of the public hearing, including "the vote of all members of the Council in deciding all questions relating to the proposed growth allocation district boundary amendment." § 19.14(c)(1)(iv)[e]. Prior to voting on the growth allocation bill a majority of council members must make a site visit to the property "to inspect the physical features of the property and to determine the character of the surrounding area." § 19.14(c)(1)(iv)[f]. If the Council votes

favorably on the growth allocation bill, the Council submits the application to the Commission "for approval as an amendment to the County's Critical Area Program." § 19.14(c)(1)(iv)[g]. No provision is made in the County Zoning Ordinance regarding the Council's rejection of a growth allocation bill. Prior to the Council's rejection of the growth allocation requested in this case the Council had never failed to enact a growth allocation bill for a project that met the requisite criteria.

The Council's power to make piecemeal reclassifications of properties within the boundaries of the Critical Area is governed under § 19.14(c)(1)(iv) ("Growth Allocation District Boundary Amendments in Critical Area"). Section 19.14(c)(1)(ii) addresses the Council's power to make "[a]mendments to the Official Zoning District Maps excepting properties within the boundaries of the Critical Area where growth allocation is requested." Unlike the growth allocation provisions, § 19.14(c)(1)(ii)[i] specifically provides:

"The fact that an application for a district boundary amendment complies with all the specific requirements and purposes set forth in this Ordinance shall not be deemed to create a presumption that the proposed district boundary amendment would in fact be compatible with surrounding land uses and is not, in itself, sufficient to require approval."

Further, § 19.14(c)(1)(ii)[k], unlike the growth allocation provisions, addresses the denial of a district boundary amendment by imposing a one year waiting period before reapplication.

## II

The appellant, Bucktail, LLC (Bucktail), was formed in 1995 to acquire and develop a 93.59 acre tract in the County known as Dawson's Farm. This property is located about six-tenths of a mile west of the town of St. Michaels. A portion of the property, 20.83 acres, is located outside of the Critical Area and is zoned Town Residential.

The remaining 72.76 acres of Dawson's Farm are within the Critical Area and, by that program, are zoned RCA. By statute, development in RCAs is limited to one unit per twenty

acres, thereby limiting development of Bucktail's RCA parcel to three dwelling units. NR § 8–1808.1(d); *accord* § 19.3(a)(1)(ii)[a].

In August 1995, Bucktail applied for a growth allocation to reclassify by district boundary amendment the 72.76 acre parcel from RCA to LDA within the Critical Area, and to reclassify that parcel's underlying zoning from Rural Conservation (RC) (Critical Area only), § 19.3(a)(1)(ii), to Rural Residential (RR) (Critical Area only). § 19.3(a)(1)(iii). RR zoning and LDA zoning permit development of one dwelling unit per five acres. Thus, with a growth allotment, that is, a reclassification to LDA in the overlaid Critical Area zoning, together with a reclassification to RR in the underlying Euclidean zoning, Bucktail would be able to develop fourteen dwelling units on the Critical Area parcel.

In a memorandum to the Planning Commission, the planning staff opined that "[Bucktail's] application has met all mandatory submittal requirements." Within a week thereafter the Planning Commission recommended approval of Bucktail's application, subject to certain conditions that are not presently relevant. On January 28, 1997, Bills Nos. 640 and 641 were introduced into the Council.[2]

Following a public hearing on the two bills, the Council voted four to one against Bill No. 641 on March 11, 1997. The Council made findings of fact. Those relevant to the issues here are the following:

"(5) The proposed District Boundary Amendment from RC Rural Conservation to RR Rural Residential is a Critical Areas Growth Allocation request and as such the Council must find that the request complies with the Critical Area Policies and applicable design standards set forth in Section 19.14(c)(iv) of the Zoning Code of Talbot County.

---

**2.** Each bill would have effected the requested changes. The difference was that Bill No. 640 conditioned the changes upon the approval and recordation of a final plat within two years after approval of a preliminary plat.

"(6) The County Council finds 'upon the basis of the evidence of record' that the request for Critical Area Growth Allocation does not comply with all of the Critical Area Policies and applicable design standards as referenced in Section 19.14(c)(iv) of the Zoning Code of Talbot County.

"(7) The County Council finds that the Growth Allocation request is not consistent with the purposes and intent of the Talbot County Comprehensive Plan.

"(8) The County Council finds that the proposed change will not be compatible with existing and proposed development and land use in the surrounding area.

"(9) The County Council finds upon the basis of the evidence of record that there have been no population changes that would suggest this reclassification to be wise.

"(10) The County Council finds that the availability of public facilities and the present and proposed transportation patterns do not support the reclassification.

"(11) Five members of the Council inspected the site prior to voting.

"(12) In light of the above findings, the Bill requesting Critical Area Growth Allocation and reclassification of the property from RC Rural Conservation to RR Rural Residential will be denied."

Bill No. 640 was tabled.

Bucktail petitioned for judicial review. Neighboring property owners, appellees John W. Renner, Richard J. Conway, Robert Porter, and Sidney H. Dickson (collectively RCPD), intervened in support of the County's decision. The circuit court affirmed, ruling that there was substantial evidence to support the Council's denial of the requested growth allocation, based on the findings that the request did not comply with all of the § 19.14(c)(1)(iv) criteria and that the request was not consistent with the County comprehensive plan nor with existing and proposed development in the area. Further, the court disagreed with Bucktail's argument that once it met the § 19.14(c)(1)(iv) criteria the Council must approve the growth allocation request.

Bucktail appealed to the Court of Special Appeals. On our own motion we issued a writ of certiorari prior to consideration of the matter by that court.

The appellees have moved to dismiss Bucktail's appeal because there is no statute authorizing review of the Council's action on a growth allocation application. If the matter is properly before us the parties join issue over the correct standard of review and over the application of the correct standard to the facts of this case. In addition Bucktail argues that the Council failed to render specific findings of facts as required by law.

### III

■ The appellees have moved to dismiss, contending that there is no statute making the Council's action judicially reviewable. Bucktail's petition for appeal to the circuit court recites that it is filed "pursuant to Maryland Rule 7–202." The cited rule, however, does not grant a right of judicial review, and it is inapplicable where judicial review is not authorized by statute. *Urbana Civic Ass'n, Inc. v. Urbana Mobile Village, Inc.*, 260 Md. 458, 462–63, 272 A.2d 628, 631 (1971).

■ The Charter that the County adopted in 1974 provides for a county manager form of government. Charter of Talbot County, Maryland (1977), Art. III. All powers which may be exercised by the County are vested in the Council. Charter § 202. A board of appeals is created under § 501 of the Charter which may hear and decide matters including "Zoning matters, exclusive of rezoning." Charter § 502(1). The County Zoning Ordinance, effective June 22, 1991, contains a provision for an "appeal" by "[a]ny person aggrieved by any decision of the Board of Appeals" to the Circuit Court for Talbot County. § 19.14(d)(1). There is, however, no provision in the Charter or Zoning Ordinance for judicial review of a zoning reclassification by the Council, comprehensive or piecemeal, within or without the Critical Area.

Bucktail's reply to appellees' dismissal argument is that its petition may be considered to invoke the original jurisdiction of the circuit court under the doctrine illustrated in *Criminal Injuries Compensation Board v. Gould,* 273 Md. 486, 331 A.2d 55 (1975). *Gould* held that there is an inherent right to judicial review of actions by an administrative agency, despite the fact that in *Gould* the applicable statute expressly provided that there would be no judicial review, absent certain conditions which admittedly were not met in that case. *Id.* at 500–01, 512, 331 A.2d at 65, 71.

Recently, in *Gisriel v. Ocean City Board of Supervisors,* 345 Md. 477, 693 A.2d 757 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 702, 139 L.Ed.2d 645 (1998), we applied the *Gould* principle. In *Gisriel,* an "appeal" had been taken, pursuant to the Ocean City Charter, to the Circuit Court for Worcester County to review a determination by the City Council of Ocean City which in turn reviewed voter eligibility determinations by the Ocean City Board of Supervisors of Elections. Answering an argument that there was no right of appeal from the circuit court in view of Maryland Code (1974, 1998 Repl.Vol.), § 12–302(a) of the Courts and Judicial Proceedings Article (CJ), we held that the complaint in the circuit court, in addition to invoking the judicial review jurisdiction of the circuit court, invoked its mandamus jurisdiction so that the right of appeal was conferred by CJ § 12–301. In this connection we said that

> "where a particular action against an administrative agency was allegedly brought under a statutory judicial review provision, and did not purport to be a mandamus action, this Court has looked to the substance of the action, has held that it could be treated as a common law mandamus or certiorari action, and has exercised appellate jurisdiction."

*Gisriel,* 345 Md. at 500, 693 A.2d at 768. *See also Heaps v. Cobb,* 185 Md. 372, 380, 45 A.2d 73, 76 (1945) (reviewing administrative action in the absence of statutory provision for judicial review); *Hecht v. Crook,* 184 Md. 271, 280, 40 A.2d 673, 677 (1945) (same).

Accordingly, the motion to dismiss the appeal is denied.

IV

■ Bucktail contends that the standard for review of the Council's determinations is substantiality of the evidence, asserting that Bucktail's entitlement to a growth allocation is not even fairly debatable. The appellees' response is that the Council's action was legislative. Appellees' point is not that legislative action is beyond challenge in the courts, but that the applicable standard of review is more favorable to the Council than substantiality of the evidence. Appellees rely on the distinction made in *Department of Natural Resources v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 334 A.2d 514 (1975). *Linchester* involved the constitutionality, under the separation of powers doctrine, of a statute that permitted a *de novo* jury trial of the reasonableness of administrative action in granting or denying a permit to build in wetlands. There, discussing how, "even absent [legislative authority], the judiciary has an undeniable constitutionally-inherent power to review, within limits, the decisions of . . . administrative agencies," *id.* at 223, 334 A.2d at 523, we said:

"This power of review, whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of the agency. In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries . . .; furthermore, when an agency is acting in a fact-finding capacity (quasi-judicial) the courts review the appealed conclusions by determining whether the contested decision was rendered in an illegal, arbitrary, capricious, oppressive or fraudulent manner."

*Id.* at 224, 334 A.2d at 523. *Accord Gisriel*, 345 Md. at 490 n. 12, 693 A.2d at 763 n. 12 ("Legislative or quasi-legislative decisions of local legislative bodies or administrative agencies are, of course, not subject to ordinary judicial review; instead, they are subject to very limited review by the courts.").

A

Note 12 in *Gisriel* cited only one zoning case, *County Council v. Offen,* 334 Md. 499, 639 A.2d 1070 (1994). *Offen* was a challenge to comprehensive rezoning. It was "a limited review of an action of an administrative agency, specifically, the adoption of the [Sectional Map Amendment] by the District Council." *Id.* at 507, 639 A.2d at 1073. There we plainly said: "Our decisions have consistently recognized that appellate review of a comprehensive rezoning is limited in scope." *Id.,* 639 A.2d at 1074. Numerous decisions of this Court were cited in support of that statement. *Id.* at 507–08, 639 A.2d at 1074. Here, the action under review is not comprehensive rezoning.

Appellees RCPD also cite *Board of County Commissioners v. Levitt & Sons, Inc.,* 235 Md. 151, 200 A.2d 670 (1964), for the quotation that this Court has "repeatedly held that the action of zoning or reclassification of zoning is a function that is legislative in nature." *Id.* at 158, 200 A.2d at 674. Immediately following that quoted language we further said:

"However, this does not prevent the Council from making *administrative* findings of fact, drawing administrative inferences, and arriving at administrative conclusions and decisions, when hearing an application for rezoning, and the statute clearly anticipates such action."

*Id.* Thus, a rezoning procedure is not necessarily wholly legislative or wholly adjudicatory. Piecemeal rezoning involves adjudicatory procedures, including administrative fact-finding, that form the basis of the legislative decision whether to approve or deny a rezoning application. As this Court has explained in a piecemeal rezoning case,

"[i]t is clear to us, from the general law elsewhere and our previous decisions, that the provisions set forth above make it improper and inaccurate to characterize the whole proceeding at the hearing held by the Council when considering an application for reclassification and its action of denying or granting reclassification as quasi-legislative in nature or quasi-judicial in nature. The above provisions, without

question, required the members of the Council to resolve disputed questions of adjudicative facts (as contradistinguished from legislative facts or judicial *action* ) concerning particular parties. And, when the Council was considering and determining these adjudicative facts concerning particular parties, it necessarily was performing a quasi-judicial function, even though its final action, in granting or denying the reclassification which was required to be based upon its findings of adjudicative facts, was quasi-legislative in character."

*Hyson v. Montgomery County Council,* 242 Md. 55, 64–65, 217 A.2d 578, 584 (1966) (citations omitted).

■ The determination of whether a local zoning authority is acting in an adjudicative or legislative manner "is dependent upon the nature of the particular act in which it is engaged." *Mayor of Rockville v. Woodmont Country Club,* 348 Md. 572, 585, 705 A.2d 301, 307 (1998). This determination is not based on whether the zoning decision adversely affects an individual piece of property but whether the decision itself is made on individual or general grounds.

"The difference between adjudicative and legislative facts is not easily drawn; ... adjudicative facts are facts about the parties and their activities, businesses and properties. They usually answer the questions 'of who did what, where, when, how, why, with what motive or intent' while legislative facts 'do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion.' The difference, broadly speaking, involves whether the decision is to be made on individual or general grounds. Simply because an individual has a protected interest does not entitle him to a trial-type hearing where the matter to be determined involves issues of legislative fact. That the effect of a zoning authority's decision may dramatically affect an individual is not determinative of the difference between adjudicative and legislative facts; rather, it is the nature of the decision's fact-finding process, not the ultimate effect of the decision,

that determines the party's right to an adjudicatory hearing."

*Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 711–12, 376 A.2d 483, 497 (1977) (citations omitted) (involving comprehensive rezoning), *cert. denied sub nom. Funger v. Montgomery County*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978).

The issue in *Hyson*, 242 Md. 55, 217 A.2d 578, was whether in a piecemeal rezoning the Montgomery County Zoning Ordinance required cross-examination at the reclassification hearing. The ordinance provided for a public hearing at which oral and written testimony could be submitted and of which a complete stenographic record was to be made. *Id.* at 64, 217 A.2d at 584. The county council was required to make its decision based on the evidence of record and approval or disapproval was to be on the merits. *Id.* This Court concluded that the ordinance conferred adjudicative functions on the county council when determining the facts at the rezoning hearing and therefore a right of reasonable cross-examination was permitted. *Id.* at 67, 217 A.2d at 585.

The County seeks to distinguish *Hyson* by comparing the procedural provisions in the ordinance governing that Montgomery County reclassification to the County's Zoning Ordinance. Section 19.14(c)(1)(iv)[e] of the County's Zoning Ordinance requires that "[a] complete record shall be kept of the hearing including the vote of all members of the Council in deciding all questions relating to the proposed growth allocation district boundary amendment." In the instant matter, a full transcript of the public hearing was prepared. It included a forty-four page presentation by representatives of Bucktail and thirty-four pages of comments and questions from the audience. The record also includes numerous exhibits, including a memorandum and reports from the planning commission and its staff. The parties to the instant proceedings have indicated to us no unwillingness to proceed on the record that has been made, and there is no issue presented to us concerning any claimed right to cross-examination. Consequently, any difference between the procedure that took place in

deciding this particular rezoning application and the procedure in *Hyson* does not require a conclusion that reclassification in the Critical Area is wholly legislative.

A recent case illustrates how adjudicative fact-finding functions can result in a legislative decision. In *Mayor of Rockville v. Woodmont Country Club*, 348 Md. 572, 705 A.2d 301, this Court considered whether there is a right of reasonable cross-examination at a hearing concerning the levy of a special assessment against a particular property in connection with the construction of a road and water main. The municipality argued that the special assessment hearing was legislative, in the nature of a tax, and that such legislative action is presumed correct even if the legislative body acted without any supporting evidence at all. *Id.* at 583–84, 705 A.2d at 306.

We disagreed, ruling that the hearing was adjudicative in nature: "The City's argument, however, confuses the legislative aspects of the special assessment process with the adjudicatory aspects of that process." *Id.* at 584, 705 A.2d at 306. We explained that while the ultimate decision was legislative, the proceeding involved was adjudicative in nature:

"This Court has stated that the determination of *whether* to impose a special assessment and the *mode* of imposing a special assessment are legislative determinations. Nevertheless, the application of the mode of assessment to a particular piece of property to determine the specific amount to be assessed against that particular property is an adjudicative act. The proceeding to determine the amount of benefit to a specific piece of property is adjudicatory or quasi-judicial.

. . . .

". . . In a case such as this, where the Council was holding a hearing, receiving written and oral testimony, and considering evidence to determine the specific amount of special benefit to a particular piece of property, the Council at that point was acting in a quasi-judicial capacity, even if earlier actions in the process or the final act of passing an ordi-

nance to levy a special assessment constitute legislative functions."

*Id.* at 584–85, 705 A.2d at 306–07 (citations omitted).

Similarly, in this case, while the Council's ultimate action in granting or denying a map amendment utilizing a growth allocation is legislative in nature, the process of applying the Zoning Ordinance standards to the particular facts of Bucktail's property requires adjudicative or administrative fact-finding.

### B

The case before us involves a chartered county which has determined not to confer on the board of appeals jurisdiction in piecemeal amendments of the zoning ordinance map, although such a conferral is permitted under the Express Powers Act, Maryland Code (1957, 1998 Repl.Vol.), Art. 25A, § 5(U).[3] As pointed out for the Court by Chief Judge Prescott in *Hyson:*

> "*It should be carefully noted and remembered that the holding in any zoning or rezoning case, here or elsewhere, cannot be accurately appraised without a knowledge and consideration of the constitutional and statutory provisions and the local laws and zoning regulations prevailing at the time of the decisions, below and here.*"

242 Md. at 62, 217 A.2d at 583. None of the decisions that have been cited to us or that we have cited, *supra,* deals with a piecemeal rezoning by the county council of a home rule county where there is no express statutory provision for judicial review.

---

**3.** No argument is made in this case that under Article 25A the power to make piecemeal amendments of the zoning map must be conferred on the Board of Appeals, either originally or on review of the action of an administrative officer or agency or of a county council sitting in an adjudicatory manner. See *United Parcel Serv., Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 587–91, 650 A.2d 226, 235–37 (1994); *Hope v. Baltimore County,* 288 Md. 656, 664–67, 421 A.2d 576, 580–82 (1980); *Klein v. Colonial Pipeline Co.,* 285 Md. 76, 81–83, 400 A.2d 768, 771–72 (1979).

Under the Regional District Act there is judicial review of the final action of the Montgomery County District Council on any application for a map amendment, and that proceeding is exclusive. Md.Code (1957, 1997 Repl.Vol., 1998 Cum.Supp.), Art. 28, § 8–105(a), (b). There is no express standard of review for those proceedings. Statutory judicial review is also applicable to a final district council decision in Prince George's County. *Id.* § 8–106(e). In such proceedings from the Prince George's County District Council there is a statutory standard of review which permits reversal or modification if, *inter alia,* the findings or decision are "unsupported by competent, material and substantial evidence in view of the entire record as submitted" or are "arbitrary or capricious." *Id.* § 8–106(i)(5), (6).

Under the provisions of the Zoning Enabling Act applicable to Baltimore City there is statutory judicial review of "a zoning action by the local legislative body." Md.Code (1957, 1998 Repl.Vol.), Art. 66B, § 2.09(a). "Nothing in [that] subsection shall change the existing standards for review of any zoning action." *Id.* Section 4.08 of Article 66B is applicable to non-home rule counties and to municipalities. Section 4.08(a) provides for judicial review at the instance of any person aggrieved "by a zoning action by the local legislative body." That subsection similarly does not "change the existing standards for review of any zoning action." *Id.* By way of contrast, under Articles 25A and 25B, respectively dealing with home rule for chartered and for code counties, there are no express statutory provisions for judicial review of piecemeal rezoning, if that power is exercised by the county council or county commissioners.

Thus, the County's argument to us distills to the question of whether, by its silence in its zoning ordinance with respect to any judicial review at all, the County has limited judicial review of the denial of Bucktail's application to the question of whether that denial was within the power of the Council.

 Absent a statutory standard of judicial review of administrative action the standard is that set forth in *Dickinson–*

*Tidewater, Inc. v. Supervisor of Assessments,* 273 Md. 245, 329 A.2d 18 (1974), where we said:

> "[I]t is clear in Maryland that even '[w]here [a] statute or ordinance makes no provision for judicial review, an implied limitation upon an administrative board's authority is that its decisions be supported by facts and that they be not arbitrary, capricious or unreasonable.' "

*Id.* at 255, 329 A.2d at 25 (quoting *Heaps v. Cobb,* 185 Md. 372, 380, 45 A.2d 73, 76 (1945)). *See also State v. Board of Education,* 346 Md. 633, 647, 697 A.2d 1334, 1341 (1997) (In "disputes between an individual or private entity and a government agency over a right, entitlement, benefit, or license which the individual or private entity claims is due under the law, ... courts have the authority, under Article IV of the Maryland Constitution and Articles 8 and 19 of the Maryland Declaration of Rights, to insure that the right, benefit, entitlement, etc., is not illegally or arbitrarily denied by the government").

This standard of review has been used in deciding the validity of a piecemeal reclassification that was effected by a local legislative body under a statutory scheme that did not provide any judicial review. *See Ellicott v. Mayor of Baltimore,* 180 Md. 176, 23 A.2d 649 (1942). That case was an appeal from a judgment of a court of the Eighth Judicial Circuit that sustained, against a challenge by protesting neighbors, the validity of an ordinance of the Mayor and City Council of Baltimore that had reclassified an unimproved lot, 100 feet by 145 feet, from residential to commercial use and that sustained the action of the Baltimore City Board of Zoning Appeals in granting a special exception to use the then commercially zoned lot for a gasoline filling station. The appeal arose when the procedural distinction between law and equity was in full bloom. Distinguishing between the council's action and the board of appeals' action, the property owner argued that the validity of the ordinance could not be questioned on the statutory appeal from the board's action. The owner relied on many cases, cited at 180 Md. at 180, 23 A.2d at 651, for the proposition that the challenge to the validity of

an ordinance must be by a bill in equity. This Court held that the issue of the ordinance's validity could be heard by the court in the law action involving the appeal from the board, essentially to avoid a multiplicity of actions.[4] *Id.* at 180–81, 23 A.2d at 651.

On the merits of the challenge to the validity of the ordinance in *Ellicott,* this Court affirmed, essentially applying a substantial evidence or fairly debatable test. The Court said:

"The nearest filling stations are a half mile to the west and a mile to the east. That provision may possibly be regarded as sufficient for the traffic, but it seems to the court that this is not so clearly true that the action of the City authorities and the Board should be reversed judicially as arbitrary and capricious. We must assume, if it is possible to do so, that these officials exercised their judgment on its sufficiency, and we cannot say that they did not, and acted without good reason. There will doubtless be some reduction in value of the neighboring property from construction of the additional filling station, some detraction from the beauty and attractiveness of the region as it has existed, but if the change is one within the police power of the City, not arbitrary and capricious, that is a detriment which must be suffered."

*Id.* at 184, 23 A.2d at 653.

Also instructive, and more recent, is *Bellanca v. County Commissioners of Kent County,* 86 Md.App. 219, 586 A.2d 62, *cert. denied,* 323 Md. 33, 591 A.2d 249 (1991). Kent County is a code home rule county, and, consequently, its zoning power is conferred through the incorporation by reference of Article 25A, Section 5(U) and (X) into Article 25B, Section 13. In

---

4. At the time of the decision in *Ellicott* the rule was that an administrative zoning agency could not decide challenges to the validity of the zoning ordinance, even as it applied to the property involved. That rule is no longer the law. *See Holiday Point Marina Partners v. Anne Arundel County,* 349 Md. 190, 199–200, 707 A.2d 829, 834 (1998) (citing cases). When it was decided, therefore, *Ellicott* presented a stronger argument for "legislative" classification of the council's action than would be the case today.

Kent County's initial, comprehensive zoning pursuant to the Program the appellants' property had been zoned RCA. Shortly thereafter the appellants sought a piecemeal reclassification to LDA which the County Commissioners of Kent County denied, after having been advised by the Commission that the requested map amendment should be denied. The circuit court sustained that action. The Court of Special Appeals, speaking through Judge Robert M. Bell, now Chief Judge of this Court, affirmed on the ground that there was no mistake in the original zoning within the meaning of NR § 8–1809(h)(2)(i). The opinion makes no mention of any statute either providing for judicial review or establishing the standard for review. Nevertheless, the court said: "Because the standard of review is whether there is any substantial evidence in the record to support the decision of the County Commissioners, our focus is on whether that decision is supported by the record." *Bellanca,* 86 Md.App. at 230 n. 10, 586 A.2d at 68 n. 10.

Consistently with *Ellicott* and *Bellanca,* with the judicial review statutes for rezoning in jurisdictions other than the County, and with the Maryland law involving constitutionally based judicial review of administrative adjudicatory fact-finding in contexts other than rezoning, we hold that the standard for review in the instant matter is the substantiality of the evidence.

V

■ Logically, the next step in our analysis would be to determine if the facts found by the Council are supported by substantial evidence. The difficulty here, however, is that the Council's "findings" are insufficient to permit judicial review.

"The court's task on review is *not* to ' "substitute its judgment for the expertise of those persons who constitute the administrative agency[.]" ' A reviewing 'Court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency.' A court's role is limited to determining if there is substan-

tial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law."

*United Parcel Serv., Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 576–77, 650 A.2d 226, 230 (1994) (citations omitted). *Accord Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 505, 588 A.2d 772, 778 (1991) ("[A] fundamental right of a party to a proceeding before an administrative agency [is] to be apprised of the facts relied upon by the agency in reaching its decision and to permit meaningful judicial review of those findings. In a judicial review of administrative action the court may only uphold the agency order if it is sustained by the agency's findings and for the reasons stated by the agency."); *United Steelworkers of America AFL–CIO, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62, 69 (1984) (same).

In accordance with the above standard of judicial review, in order for the reviewing court to determine whether the Council's action was fairly debatable, findings of fact are required.

■ Findings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions. *Turner v. Hammond,* 270 Md. 41, 55–56, 310 A.2d 543, 551 (1973) (local board of zoning appeals denied application for a special use exception by filling out a preprinted form; "[w]e think the 'reasons' given by the Board for denying the application suggest a rather cavalier attitude in respect of its duties and responsibilities. It made no findings of fact worthy of the name and we think citizens are entitled to something more than a boiler-plate resolution"); *Rodriguez v. Prince George's County,* 79 Md.App. 537, 550, 558 A.2d 742, 748 ("It is not permissible for the Council, or any administrative body, simply to parrot general statutory requirements or rest on broad conclusory statements."), *cert. denied,* 317 Md. 641, 566 A.2d 101 (1989); *Ocean Hideaway Condominium Ass'n v. Boardwalk Plaza Venture,* 68 Md.App. 650, 662, 515 A.2d 485, 490–91 (1986) ("Although the Ocean City Board [of

Zoning Appeals] did not use a prepared printed form, the method it used and the content of its 'Findings of Fact' amount to a simple repetition of the nine statutory requirements and nothing more.").

Other judicial review cases have presented the issue of insufficient findings of fact by an administrative agency or local legislative body. In a case decided prior to *United Steelworkers, supra*, a Baltimore City board denied a city employee accidental disability retirement benefits. *Baker v. Board of Trustees*, 269 Md. 740, 741, 309 A.2d 768, 768 (1973). The circuit court, in effect, affirmed in a mandamus action. *Id.*, 309 A.2d at 769. The board had refused to apprise the employee of the reasons for its denial simply because no statute required the board to do so. *Id.* at 746–47, 309 A.2d at 771. In affirming on the basis that there was substantial evidence to sustain the decision, this Court stated that it would "remand, for appropriate findings of fact, any case which hereafter reaches us in the posture of this one." *Id.* at 747, 309 A.2d at 772. We explained that "[t]his is no more than a recognition of the fundamental right of a party to be apprised of the facts relied upon by the agency, and, even in the absence of a statutory provision, is frequently required by a court as an aid to judicial review." *Id.* (citation omitted).

In *Board of County Commissioners v. Ziegler*, 244 Md. 224, 223 A.2d 255 (1966), the Board of Commissioners of Prince George's County, sitting as a district council, denied an application for a special exception. *Id.* at 226, 223 A.2d at 256. The circuit court reversed. *Id.* On appeal, the problem was that, contrary to the requirements of the county zoning ordinance, the district council failed to make findings of fact in the record on which its decision was based. *Id.* at 228, 223 A.2d at 257. Remanding for such findings of fact, we explained:

> "There are several reasons for requiring a more comprehensive record of what transpired in this case at the hearing before the district council. Aside from the rule that a zoning authority, in the absence of evidence to support its action, cannot apply its expertise in granting or refusing a zoning change or exception, it is clear that without a record

of the facts on which the zoning authority acted or a statement of the reasons for its action, the reviewing court could not properly perform the duty it had of determining whether the action of the zoning authority was arbitrary or capricious. The rule is as applicable to a special exception as it is to a reclassification.

"Where, as seems to be the case here, the decision of the zoning authority is apparently contrary to the weight of the evidence introduced on behalf of the applicants for the special exception, the zoning authority should have stated the reasons for its action and included them in the record. When this is not done, the record should be remanded for the purpose of having the deficiency supplied."

*Id.* at 228–29, 223 A.2d at 257–58 (citations omitted). *See also Harford County v. Earl E. Preston, Jr., Inc.*, 322 Md. at 505, 588 A.2d at 778 ("The [county council sitting as a board of appeals] made no attempt to reconcile the contradictory findings of fact by its hearing examiner in his two reports as to whether the adverse impacts upon the neighborhood of the [owners'] proposed special exception uses were beyond those inherently associated with such special exception uses irrespective of their location within the AG zone.").

In *Mossburg v. Montgomery County*, 329 Md. 494, 620 A.2d 886 (1993), we struck down a supermajority requirement for action by a board of appeals on the following rationale:

"Where there is a supermajority requirement, however, and where (as in the case at bar) a majority but not a supermajority of the Board of Appeals votes to grant an application, there will usually be no findings of fact or conclusions of law setting forth the basis for the agency's denial. Furthermore, the settled principle that an agency's decision will be judicially reviewed only on the grounds relied upon by the agency cannot be adhered to under such circumstances. In addition, while there may be in a particular case substantial evidence supporting the denial of an application on a certain ground, such ground may not have

been the basis for the minority votes. In fact, the two minority members might not agree with each other."
*Id.* at 508, 620 A.2d at 893.

One leading commentator has articulated the rule in the manner set forth below:

" 'Given express findings, the court can determine whether the findings are supported by substantial evidence, and whether the findings warrant the decision of the board. If no findings are made, and if the court elects not to remand, its clumsy alternative is to *read* the record, *speculate* upon the portions which probably were believed by the board, *guess* at the conclusions drawn from credited portions, *construct a basis* for decision, and *try to determine* whether a decision thus arrived at should be sustained. In the process, the court is required to do much that is assigned to the board, and the latter becomes a relatively inefficient instrument for the construction of a record.' "

*Gough v. Board of Zoning Appeals*, 21 Md.App. 697, 702, 321 A.2d 315, 317–18 (1974) (emphasis court's) (quoting 3 R.M. Anderson, *American Law of Zoning* § 16.41, at 242 (1968)); *see also Ocean Hideaway Condominium Ass'n v. Boardwalk Plaza Venture*, 68 Md.App. at 662, 515 A.2d at 490 (same).

In the instant case, the Council made twelve "Findings of Fact." Findings one through four pertain to the procedural history and have not been set forth in Part II, *supra.* Findings five through twelve are set forth in Part II, *supra.* Finding five simply refers to § 19.14(c)(1)(iv) as controlling. Finding eleven states that the required site visit was made, and finding twelve states that, "[i]n light of the above findings," the application is denied. We are concerned here with findings six through ten.

Findings seven, eight, nine, and ten appear to be based on five criteria set forth in § 19.14(c)(1)(ii)[f] that are required to be considered for certain amendments to the zoning maps, as shown by the comparison set forth in the margin.[5]

---

5.

| Council's Findings of Fact | § 19.14(c)(1)(ii)[f] |
|---|---|
| | "In granting approval for an amendment to the Official Zoning Maps, the |

The introduction to subsection (ii) expressly states the scope of subsection (ii). It deals with "Amendments to the Official Zoning District Maps excepting properties within the boundaries of the Critical Area where growth allocation is requested." § 19.14(c)(1)(ii). In contrast, subsection (iv) deals with "Growth Allocation District Boundary Amendments in [the] Critical Area." Thus, the directly applicable criteria for Bucktail's requested rezoning are the nine criteria established by § 19.14(c)(1)(iv)[b], which are set forth in Part I, *supra.* In a case such as the instant one, if the developer can satisfy the criteria of subsection (iv) on a request for rezoning from one dwelling unit per twenty acres to one dwelling per five acres, the developer will have complied with the requirements for rezoning a property in the Critical Area from RCA to LDA. It would seem that reclassification under the underlying zoning from RC to RR would then follow, simply because there are no additional applicable requirements in the zoning ordinance. Thus, findings seven through ten appear to be irrelevant.

Finding six reads:

| | |
|---|---|
| | Council shall take into consideration findings of fact in each specific case, including but not limited to the following: |
| "(7) The County Council finds that the Growth Allocation request is not consistent with the purposes and intent of the Talbot County Comprehensive Plan. | "[1] Consistency with the purposes and intent of the Talbot County Comprehensive Plan; |
| "(8) The County Council finds that the proposed change will not be compatible with existing and proposed development and land use in the surrounding area. | "[2] Compatibility with existing and proposed development and land use in the surrounding area; |
| "(9) The County Council finds upon the basis of the evidence of record that there have been no population changes that would suggest this reclassification to be wise. | "[3] Availability of public facilities; |
| "(10) The County Council finds that the availability of public facilities and the present and proposed transportation patterns do not support the reclassification." | "[4] The effects on present and future transportation patterns; and |
| | "[5] The effect on population change within the immediate area." |

"The County Council finds 'upon the basis of the evidence of record' that the request for Critical Area Growth Allocation does not comply with all of the Critical Area Policies and applicable design standards as referenced in Section 19.14(c)(iv) of the Zoning Code of Talbot County."

This finding does not advise Bucktail, in terms of the facts and circumstances of the record, in which aspect(s) Bucktail's application fails to comply with the Critical Area criteria or policies. Thus, finding six is deficient under the legal principles reviewed above.

In the alternative, we shall assume that the requirements of subsection (ii), as well as those of (iv), must be complied with to obtain the reclassifications at both levels of zoning that are requested here. Findings seven through ten, *see* note 5, *supra*, suffer from the same deficiency as does finding six. These findings fail to advise Bucktail, in terms of the facts and circumstances of the record, in which aspect(s) the application is deficient under subsection (ii).

Council findings six through ten are merely conclusory statements. Here, where the planning staff and the Planning Commission have recommended approval of Bucktail's project and found that it complies with all applicable requirements, it is not sufficient for the Council simply to express conclusions, without pointing to the facts found by the Council that form the basis for its contrary conclusion.

The appellees, by brief and at oral argument, have pointed to certain facts in the record that arguably might justify the denial of Bucktail's application, but these arguments cannot cure the deficiency. As this Court has stated: "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action...." *United Steelworkers*, 298 Md. at 679, 472 A.2d at 69 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207, 216 (1962)).

Accordingly, the appropriate disposition in the instant matter is a remand.

*JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY VACATED. CASE REMANDED TO THAT COURT FOR REMAND TO THE COUNTY COUNCIL OF TALBOT COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES, TALBOT COUNTY, MARYLAND, JOHN W. RENNER, RICHARD J. CONWAY, ROBERT PORTER, AND SIDNEY H. DICKSON.*