909 A.2d 235

**MARYLAND OVERPAK CORPORATION**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

No. 76, Sept. Term, 2005.

Court of Appeals of Maryland.

Oct. 16, 2006.

John C. Murphy, Baltimore, MD, for appellant.

Sandra R. Gutman, Chief Sol. (Ralph S. Tyler, III, City Sol., and Adam Levine, Asst. City Sol., Baltimore City Dept. of Law, Baltimore, MD); Herbert Better (P. Andrew Torrez of Zuckerman Spaeder, L.L.P., Baltimore, MD), all on same brief, for appellee.

Argued before BELL, C.J., WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE and JOHN C. ELDRIDGE (retired, specially assigned), JJ.

HARRELL, Judge.

This case requires us to explore once again what constitutes a "zoning action," as that term is used in Md.Code (1951, 2003 Repl.Vol., 2005 Suppl.), Art. 66B, § 2.09(a)(1)(ii),[1] taken by the

---

1. Art. 66B. Land Use

 [Zoning in Baltimore City]
 § 2.09. Appeals to courts.

Mayor and City Council of Baltimore. A "zoning action" is subject to judicial review by the Circuit Court for Baltimore City and, if further review is sought in timely fashion, by the Court of Special Appeals of Maryland.[2] Judicial review proceeds as directed by Title 7, Chapter 200 of the Maryland Rules.[3] If the action taken in the present case is determined not to be a "zoning action," we alternatively are asked to consider whether other modalities of legal process are available for judicial scrutiny of the action taken in this case.

Engaging in this inquiry, we do not write on an entirely clean appellate slate. *See, e.g., Armstrong v. Baltimore City,* 390 Md. 469, 889 A.2d 399 (2006) (*Armstrong II*) (holding that the Court of Special Appeals possessed jurisdiction to consider an appeal from the Circuit Court's dismissal of a petition for judicial review, filed under Art. 66B, § 2.09, complaining about an ordinance permitting an accessory parking lot in Baltimore); *Wesley Chapel Bluemount Ass'n v. Baltimore County,* 347 Md. 125, 699 A.2d 434 (1997) (reviewing the holding of *Stephans II, infra,* in determining the scope of "any other zoning matter" under Md.Code (1974, 1995 Repl.Vol.), State Gov't Art. § 10–503(b)); *Bd. of County Comm'rs of Carroll County v. Stephans,* 286 Md. 384, 408 A.2d 1017 (1979) (*Stephans II*) (holding that the legislative history of § 2.09 contemplates that a "zoning action" means "zoning reclassification" and not legislative-type actions), *rev'g,* 41 Md.App. 494, 397 A.2d 289 (*Stephans I*); *Armstrong v. Mayor & City Council of Baltimore,* 169 Md.App. 655, 906 A.2d 415 (2006) (*Armstrong III*) (2006) (holding that a parking lot ordinance

---

(a) *Who may appeal; procedure.*—(1) An appeal to the Circuit Court of Baltimore City may be filed jointly or severally by any person, taxpayer, or officer, department, board, or bureau of the City aggrieved by:

\* \* \*

(ii) A zoning action by the City Council.

2. Art. 66B, § 2.09(e).

3. Art. 66B, § 2.09(a)(2).

qualified as a conditional use or its equivalent such that its issuance was a quasi-judicial act subject to judicial review under § 2.09 and disapproving contrary language in *MBC Realty, infra*); *Cremins v. County Comm'rs of Washington County,* 164 Md.App. 426, 883 A.2d 966 (2005) (holding that a planned unit development granted in Washington County under its zoning regulations amounts to a "zoning reclassification" for purposes of judicial review under Art. 66B, § 4.08, the companion section to § 2.09 for non-charter counties); *MBC Realty, LLC v. Mayor & City Council of Baltimore,* 160 Md.App. 376, 864 A.2d 218 (2004) (holding that local ordinance permitting specific conditional uses and making text amendments to zoning ordinance were not "zoning actions" under § 2.09); *Gregory v. Bd. of County Comm'rs of Frederick County,* 89 Md.App. 635, 599 A.2d 469 (1991) (holding that a piecemeal zoning action is appealable under § 4.08, but adoption of an amendment to county's comprehensive water and sewage plan was not a "zoning action"). These decisions are instructive in that they delineate general analytical contours for determining whether a governmental action concerning a type of land use decision amounts to a "zoning action" and thus is eligible for judicial review in accordance with Title 7, Chapter 200 of the Maryland Rules. These precedents, however, leave some portion of *tabula rasa* open on the narrow question presented by this case, given the somewhat unique character of zoning processes in Baltimore City and the particular facts of the controversy before us. We must decide here whether an amendment of a previously approved planned unit development ("PUD")[4] granted to Canton Crossing,

---

4. A PUD is a relatively modern zoning concept created to provide a degree of flexibility in uses and design not available under strict Euclidian zoning. Essentially, a PUD, when approved by a governmental body, grants a variety of uses within a development that would otherwise not be permitted under the pre-existing or, in the case of Baltimore City's zoning regulations, underlying Euclidian zoning of the pertinent parcel or assemblage of land. A distinguishing feature of PUDs is the incorporation of a form of site planning requirement at its inception and/or in the latter stages of the overall approval process, if that process is multi-tiered. For a more extensive discussion of PUDs, see *Rouse–Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments for*

LLC, by the Mayor and City Council, via City Ordinance 04–873, amounted to a "zoning action" under Md.Code, Art. 66B, § 2.09(a)(1)(ii), thus bestowing upon the Circuit Court for Baltimore City jurisdiction to consider on their merits neighboring landowners' petitions for judicial review of that amendment approval.

## I.

The operative facts in this case are largely undisputed. On 21 June 2001, the City Council passed, and the Mayor signed into law, Ordinance 01–192 granting Appellee, Canton Crossing, LLC, *inter alia*, an industrial PUD and approving a development plan for a 67 and one-half acre [5] parcel of land in the Canton area of Baltimore City. The property previously was placed solely within a Euclidian [6]—3 Industrial District, which is "designed for industrial, manufacturing, and related activities generally known and described as 'heavy industry.'" Baltimore, Md., Zoning Code § 7–401. A PUD was necessary to accommodate the various residential and commercial uses,

---

*Prince George's County,* 138 Md.App. 589, 623–24, 773 A.2d 535, 555–56 (2001).

**5.** For reasons not apparent on the record, Ordinance 01–192 refers to the parcel as "consisting of 51.25 acres, more or less," while Ordinance 04–873, the enactment at issue in the present controversy, notes that the parcel "consist[s] of 67.52 acres, more or less." Because the latest amendment to the PUD is the subject of consideration here and the parties have referred in their briefs to the parcel as being approximately 67 acres in size, we shall use this figure.

**6.** The term "Euclidian," when used in a land use context, derives from the case *Village of Euclid v. Ambler Realty Company,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), where it was first elucidated. The Court of Special Appeals, in *Rouse–Fairwood,* explained this concept: "Generally, by means of Euclidean zoning, a municipality divides an area geographically into particular use districts, specifying certain uses for each district. 'Each district or zone is dedicated to a particular purpose, either residential, commercial, or industrial,' and the 'zones appear on the municipality's official zoning map.'" 138 Md.App. at 623–24, 773 A.2d at 555–56 (quoting 5 ZIEGLER, RATHKOPF'S THE LAW OF ZONING AND PLANNING (4th ed. rev. 1994), §§ 63.01, at 63–1–2).

not permitted ordinarily in the M–3 zone, proposed in Canton Crossing's development plan.[7]

The PUD, thereafter, was amended by City ordinances on three subsequent occasions as a result of changes in the development plan initiated by Canton Crossing. The first amendment occurred on 1 July 2002, via Ordinance 02–369, permitting Canton Crossing to "increase parking and square footage use on each parcel [designated for development within the 67 acres encompassed by the development plan], to increase the size of the proposed hotel, and to change the location of certain proposed structures." The second amendment, approved on 22 December 2003 by Ordinance 03–641, allowed an "increase [in] the number of hotel rooms permitted, to change the location of certain proposed structures, and to modify the uses permitted and off-street parking requirements." The last amendment, the one at issue in this case, approved by Ordinance 04–873 on 2 December 2004, authorized an "increase [in] the number of residential dwelling units permitted and [a] modif[ication] [of] the uses and buildings permitted and their locations and size." [8]

It was upon the approval of this last amendment that Appellant here, Maryland Overpak Corporation, filed on 28 December 2004 in the Circuit Court for Baltimore City its petition for judicial review. The petition alleged that Maryland Overpak was aggrieved by the PUD amendment approval because it interfered with Appellant's leasehold interest in and use of Danville Avenue as a staging area for its operations.[9]

---

7. Ordinance 01–192 alluded to an array of uses in the development plan including: "offices, retail, hotel, residences, marina, warehouse/storage, and public space."

8. Canton Crossing stated, specifically, that it "sought to increase the number of residential dwelling units from 100 to 504; to decrease the amount of office space from 1.7 million to 1.5 million square feet; to decrease the amount of retail space from 450,000 to 150,000 square feet; and to increase the amount of restaurant space from 50,000 to 120,000 square feet."

9. Maryland Overpak apparently engages in the packing and shipping overseas of industrial equipment, primarily by ocean freighters.

Within two weeks of Maryland Overpak filing its petition, two other landowners adjoining the PUD, South Highland Avenue LLC and Canton Railroad Company, joined Appellant in praying for judicial review of Ordinance 04–873. Neither of these latter entities, however, are parties to the present appeal.

Maryland Overpak and the other abutting land owners believed that the City's action in approving the amendment to the PUD encroached on their interest in the roadway. Specifically, Maryland Overpak and South Highland Avenue LLC each pled in their one paragraph petitions that they maintain a leasehold interest in Danville Avenue as well as in property abutting the PUD which would be adversely affected by the approved PUD. Canton Railroad Company, for its part, averred in its petition that it "owns and operates" Danville Avenue and that the ordinance constituted a violation of the Railroad's procedural and substantive due process rights, as well as interstate commerce clause principles.

The City Council filed a Motion to Dismiss Appeal and Request for Hearing, which was joined by Canton Crossing, LLC. Both argued that judicial review of the latest amendment to the PUD, under Art. 66B, § 2.09, was not proper and that the Circuit Court lacked jurisdiction over the case. After a hearing on the motion, the Circuit Court dismissed the petitions on 16 March 2005. The motions judge relied on

---

The development plan filed by Canton Crossing in the present amendment application shows the entirety of Danville Avenue along the southern periphery of the site conceptually as a tree-lined avenue that serves, and is part of, the PUD. This is depicted on Exhibit B–1 (the development plan) of Ordinance 04–873. Exhibit B–2 (the existing conditions plat) of the same ordinance contains the phrase "not part of this PUD" in parentheses for a major portion of Danville Avenue from its intersection with South Haven Street, as it abuts the subject property of the PUD. A small portion of Danville Avenue, along which Maryland Overpak's property apparently abuts on its south side, is depicted as being included in the PUD. Counsel for Appellant, when asked by the Court at oral argument, could not say who owned the street bed of either the included or excluded portions of Danville Avenue. Nonetheless, we proceed, *arguendo*, with the understanding that Appellant asserts a colorable interest in at least the included portion.

*MBC Realty* in reasoning that the PUD granted to Canton Crossing did not qualify as a "zoning action" under Art. 66B, § 2.09(a)(1)(ii) because it did not amount to a reclassification of the zoning district of the subject property. Maryland Overpak filed a timely appeal in the Court of Special Appeals. We, acting on our initiative, issued a *writ of certiorari* before the intermediate appellate court could consider the matter. 389 Md. 398, 885 A.2d 823 (2005).

## II.

Baltimore City is governed by a unique procedure and body of law in many respects regarding its zoning procedures. The potential for uniqueness is facilitated not merely because of the statutory grant under Art. 66B, *Boitnott v. Mayor & City Council of Baltimore*, 356 Md. 226, 238–39, 738 A.2d 881, 888 (1999) ("[A]rt. 66B, § 2.01(a) provides the general authority for the Mayor and City Council of Baltimore to adopt zoning regulations as necessary . . . ."), but also because of the general principle that zoning is an exercise of governmental authority that generally falls squarely within the province of the political subdivisions of the State. *Superior Outdoor Signs, Inc. v. Eller Media Co.*, 150 Md.App. 479, 494, 822 A.2d 478, 506 (2003) (citing Art. 23A, § 2(b)(36)(ii)) ("It is fundamental that zoning concerns the regulation of land use; and it is the policy of this State that such regulation will occur at the local level."); *see also Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 542, 814 A.2d 469, 486 (2002).[10]

Each jurisdiction in the State owes its zoning authority to delegations found in various provisions of the Maryland Code. We observed in *Rylyns* that

---

**10.** There are, however, a few instances where regional or Statewide considerations have inspired the Legislature to broaden, directly or indirectly, the purely local considerations and processes inherent in most land use decisions, e.g., the Chesapeake Bay Critical Area Protection Program scheme (Md.Code (1974, Repl. Vol. 2000), Natural Resources §§ 8–1801 to 8–1817) and the requirements for comprehensive water and sewerage plans (Md.Code (1974, Repl. Vol. 1996), Environment §§ 9–501 to 9–521).

[t]racing the entire panoply of related enabling statutes in Maryland is a tad complex. The provisions empowering municipal corporations in Maryland are contained in Maryland Code (1957, 1998 Repl.Vol.), Article 23A, and with regard to home rule powers specifically, Art. 23A, § 9. Similar provisions detailing the powers for non-charter counties are found in Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 25. Further complicating the matter, the authority of the counties of Montgomery and Prince George's are controlled by Maryland Code (1957, 1998 Repl. Vol., 2002 Supp.), Article 28. The land use provisions of Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 66B pertain primarily to Art. 23A municipalities and Art. 25 non-charter counties, although certain provisions apply to Maryland Code (1957, 1998 Repl.Vol.), Art. 25A charter counties, as well as to Montgomery and Prince George's Counties, Art. 66B, §§ 1.02 and 7.03, and also to the City of Baltimore, Art. 66B, §§ 2.01–2.13 and 14.02.

372 Md. at 528, 814 A.2d at 476–77. Of course, in this case we are concerned only with Article 66B, which provides for judicial review of "zoning actions" taken by the Mayor and City Council of Baltimore. Md.Code, Art. 66B, § 2.09(a)(1)(ii).

### A.

Baltimore City, in Title 9 of the Baltimore City Zoning Code, has developed a scheme for evaluating, approving, and administering PUDs. The process of obtaining a PUD is initiated by a mandatory conference between the developer and the Planning Commission to discuss the scope and nature of the PUD. Baltimore, Md., Zoning Code § 9–105(a). The developer is required to create a detailed development plan, *id.* § 9–105(b), which must include, at a minimum: a map indicating accurate boundary lines and the project area in relation to surrounding properties; the placement of roadways and parking facilities; the use, size, and location of existing and proposed buildings and landscaping; architectural drawings of proposed structures; the location of existing and proposed sewer and water facilities; the existing storm drain-

age pattern along with proposed drainage system; the location of recreation and open spaces; statistical data on size, density, and proposed number of residential units; a copy of property owners' association documents and protective covenants; and a detailed time schedule for start and completion of the PUD. *Id.* § 9–107. The application is then submitted to the Council in the form of a proposed ordinance (a bill, in legislative vernacular) for approval of the development plan. *Id.* § 9–106.

Once a bill proposing a PUD has been submitted to the Council, it must be reviewed by the Board of Municipal and Zoning Appeals, the Planning Commission, and any other agencies deemed relevant by the President of the City Council. *Id.* §§ 9–111, 16–301. These reviewing entities apply a multitude of governing standards that essentially ensure that the proposed PUD will conform with the surrounding area in terms of contemplated development; topography; value of surrounding areas; availability of light, air, open space, and street access; and risks of public and health hazards. *Id.* § 9–112. If the Council is satisfied with the development plan and reports from the reviewing agencies, it may approve the PUD in the form of an ordinance. *Id.* § 9–113. Upon approval, the approved PUD is designated on official zoning maps "for informational and reference purposes" and a copy of the development plan is kept on file by the Zoning Administrator. *Id.* § 9–116. Frequently, the approval expressed in the ordinance contains conditions.

The PUD designation, acting as an overlay for a specific parcel or assemblage of properties, is placed on top of the underlying zone or zones, in the present case a Euclidian zone. The underlying zone remains and is retained on the official Zoning Map for the City even after the PUD is approved. With the exception of minor changes to the interior features of buildings and the time schedule of completing the PUD, *id.* § 9–118(c), (d), amendments to an approved PUD are achieved only through an application process as in the case of a new PUD application. *Id.* § 9–118(a). Because the development plan and its authorizing ordinance serve as a binding agree-

ment between the developer and the City for the development of the affected property, *id.* § 9–117, deviation from that plan or the requirements of Title 9 may result in revocation of the PUD.[11] *Id.* § 9–119(a).

There exist additional standards for Industrial PUDs, such as the one at issue *sub judice.* The first set of standards concern the effects of: noise; vibration; smoke and particulate matter; toxic matter; odorous matter; and glare. *Id.* §§ 9–216; 12–102. There are also additional sections of Title 9 governing the permissible uses and acreage required for Industrial PUDs. *Id.* § 9–501 *et seq.* Notably, an Industrial PUD may carry out the uses permitted in the underlying zoning district, as well as whatever conditional uses that are designated for that district as specified in the development plan. *Id.* § 9–502. The provisions of Title 3, which set out the generally applicable zoning rules for use and bulk, also govern Industrial PUDs. *Id.* § 9–501.

### B.

Just as Baltimore City has a distinct scheme for PUDs, it so too has one for conditional uses,[12] a concept that deserves a proper introduction. The conditional use, which is not to be confused with conditional zoning, *see Rylyns,* 372 Md. 514, 541 n. 16, 814 A.2d 469, 485 n. 16, is a zoning mechanism which provides a greater degree of flexibility to land owners and developers who wish to utilize their property in ways that

---

**11.** Where cancellation of the PUD is sought, the developer must be given 15 days notice to answer to the City's Zoning Administrator for the noncompliance. The Zoning Administrator may, if no satisfactory explanation is given, order the PUD to be cancelled. *Id.* § 9–119(b), (c).

**12.** As we have noted in previous decisions, a "conditional use" has an alias by which it is sometimes known elsewhere in Maryland, a "special exception," although the two terms are largely synonymous. *Rylyns,* 372 Md. at 541 n. 16, 814 A.2d at 485 n. 16. While there may be a highly-nuanced distinction between the two terms, *see Lucas v. People's Counsel for Baltimore County,* 147 Md.App. 209, 227 n. 20, 807 A.2d 1176, 1186 n. 20 (2002), we shall use the term "conditional use" here as encompassing both concepts.

ordinarily and inherently would conflict with the zoning district in which their property is placed. *See Rylyns,* 372 Md. at 541–43, 814 A.2d at 485–86. The universe of allowable conditional uses for a given zoning district is designated by the legislative body at the time it establishes in the text of the zoning regulations the various zoning classifications and uses permitted in that zoning district. *Rylyns,* 372 Md. at 541, 814 A.2d at 485. If a land owner wishes to establish a conditional use he, she, or it must petition the relevant local governmental body, which, in turn, makes a determination of the acceptability of the proposed use, weighing, among other things, its putative unique adverse effects on the surrounding community and zoning district. *Mossburg v. Montgomery County,* 107 Md.App. 1, 5–6, 666 A.2d 1253, 1257 (1995).

The regulations governing the consideration of conditional uses in Baltimore City is found in Title 14 of the Baltimore City Zoning Code. The Zoning Code provides that the Mayor and City Council may approve a request for a conditional use by ordinance and, additionally, may impose conditions on its approval. §§ 14–102, 103. Bills that would create conditional uses by ordinance must satisfy the requirements of Title 16. *Id.* §§ 14–208; 16–101(b)(2). These requirements mandate that the conditional use applicant present to the City Council and the public a statement of intent with respect to the property, which must be posted on the property in question in a specified manner and for a specified time. *Id.* §§ 16–202, 203. The bill is then referred to the Board of Municipal and Zoning Appeals and the Planning Commission and also may be referred to other relevant agencies. *Id.* § 16–301. Following a bill's second reading, it is subject to a public hearing before the committee to which the bill was originally referred with 15 days prior notice thereof. *Id.* §§ 16–401, 402.

The intersecting standards and characteristics of conditional uses and PUDs in the Baltimore City zoning regulations informs the conclusion that, by analogy, a PUD partakes more of the characteristics of a conditional use than any other zoning construct or mechanism recognized in Baltimore City. One particularly telling similarity is that PUDs in the City are

first evaluated under the very same "governing standards" applied to conditional uses. Only after that are additional criteria considered. *Id.* § 9–112(a). Also, the zoning regulations state that changes to a PUD seeking a use that is designated already by regulation as a possible conditional use for the underlying zoning district does not require a new application, but are reviewed under a more deferential process. *Id.* § 9–118(b). A similar provision elsewhere in Title 9 of the zoning regulations provides that an Industrial PUD may carry out the uses permitted in the underlying industrial district classification, as well as whatever conditional uses are designated for that district. *Id.* § 9–502. Although the Baltimore City zoning regulations undeniably set PUDs and conditional uses apart as distinct branches of the land use array, *see id.* tits. 9, 14, the regulations consistently employ the conditional use as a means of both understanding and administering the PUD.

Also, as we have discussed previously, PUD proposals arise as a result of an individual owner or developer petitioning the City to provide for uses not yet permitted "as of right" in the underlying district. *Id.* § 9–105. The hallmarks examined for their approval generally are compatibility with a Master Plan, conformance to regulatory criteria, and an examination of potential deleterious effects vís-a-vís adjacent property and uses. Proposed conditional uses call for a similar analysis, but are designated by the text of the zoning regulations, and require an individual to seek permission to use his or her parcel in accord with a particular conditional use. *Rylyns*, 372 Md. at 541, 814 A.2d at 485. A PUD allows for additional uses on a property not provided for by the permitted or conditional uses designated in that underlying district, but which are adjudged, on a case-by-case basis, not to be incompatible or deleterious at a given location and within the contemplation generally of the applicable Master Plan (or other planning document) and the general purposes of the underlying zone, much like a conditional use.

### III.

Implicit in the grant of authority to jurisdictions in the State to adopt their own particular zoning regulations consistent with that statutory grant is the reality that each jurisdiction likely will vary, to some degree, one from another, in its zoning regulations. Nonetheless, no matter how a local regulation is couched, an act constituting a "zoning action" for those jurisdictions governed by Art. 66B is subject to judicial review. Until the Court of Special Appeals filed its recent opinion in *Armstrong III*, the prevailing rule was that *only* zoning reclassifications constituted "zoning actions" under § 2.09(a)(1)(ii). *Compare Armstrong III*, 169 Md.App. at 674, 677–78, 906 A.2d at 426, 428 ("[T]he final question before reaching a conclusion, is whether 'zoning action' is limited to reclassifications. We conclude it is not . . . ."), *with MBC Realty*, 160 Md.App. at 387, 389, 864 A.2d at 224, 225 (including reclassifications within "zoning action," but excluding comprehensive zonings, comprehensive rezonings, text amendments to zoning ordinances, and conditional uses). Because, as previously discussed, conditional uses and PUDs in Baltimore share strong ties, we consider the reasoning and holding in *Armstrong III* before proceeding with our analysis in the present case.

### A.

In *Armstrong III*, the Court of Special Appeals retreated from its broad holding in *MBC Realty* that a conditional use granted in Baltimore City was not a zoning reclassification, and thus not a "zoning action" eligible for judicial review under § 2.09. 169 Md.App. at 677–78, 906 A.2d at 428. The court also modified its approach to ascertaining the scope of review under § 2.09,[13] by first inquiring as to whether the governmental action in question was legislative or quasi-judi-

---

13. Statutory judicial review must be authorized expressly by some form of legislative action, such as a statute or ordinance. *Armstrong II*, 390 Md. at 474, 889 A.2d at 402.

cial [14] in nature. 169 Md.App. at 666–73, 906 A.2d at 422–25. The intermediate appellate court noted that legislative actions are subjected to a more limited review by the courts than are quasi-judicial actions, 169 Md.App. at 666, 906 A.2d at 422 (citing *Dep't of Natural Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 224, 334 A.2d 514, 523 (1975) (indicating that the scope of review regarding legislative actions is whether the body was acting within its legal authority)), thus leaving only quasi-judicial actions subject to § 2.09 review. *See* 169 Md.App. at 666, 906 A.2d at 422 ("[T]he first question we must resolve is whether ... the City Council was acting in a quasi-judicial, or administrative capacity, rather than in a legislative one."); *see also Gisriel v. Ocean City Bd. of Supervisors of Elections,* 345 Md. 477, 490 n. 12, 693 A.2d 757, 763 n. 12 (1997) ("Legislative or quasi-legislative decisions of local legislative bodies or administrative agencies are, of course, not subject to ordinary judicial review; instead, they are subject to very limited review by the courts.").

■ The outcome of the analysis of whether a given act is quasi-judicial in nature is guided by two criteria: (1) the act or decision is reached on individual, as opposed to general, grounds, and scrutinizes a single property, 169 Md.App. at 666–69, 906 A.2d at 422–23; and (2) there is a deliberative fact-finding process with testimony and the weighing of evidence. 169 Md.App. at 668–71, 906 A.2d at 423–24. The *Armstrong III* court emphasized the fact-finding process as the most weighty criterion, *id.* at 668–69, 906 A.2d at 423 (quoting *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 712, 376 A.2d 483, 497 (1977)).

The *Armstrong III* court also relied on our discussion in *Mayor and Council of Rockville v. Woodmont Country Club* regarding the Rockville City Council's quasi-judicial process in considering the amount to be levied for a special assessment, 348 Md. 572, 585, 705 A.2d 301, 307 (1998), in concluding that

---

**14.** In the interests of clarity and consistency, we use the term "quasi-judicial" in lieu of a synonym: administrative adjudication.

the parking lot ordinance at issue in *Armstrong III* was also the product of quasi-judicial processes. 169 Md.App. at 668–71, 906 A.2d at 423–24. In *Woodmont Country Club*, the City of Rockville had constructed a planned road named Wooten Parkway, together with a water main. 348 Md. at 576, 705 A.2d at 303. The country club, along whose property part of the road and water main project ran, challenged the benefit assessment amount to be levied against it by the City for the construction project and requested on three occasions, all to no avail, that the City produce for cross-examination the appraisers who had generated the figures used by the City in determining the amount. *Woodmont Country Club*, 348 Md. at 579, 705 A.2d at 304. At the hearing before the City Council for the proposed assessments, Woodmont presented its own witnesses: a traffic consultant, a land planner, and a land appraiser; all who disputed the City's assessment. *Woodmont Country Club*, 348 Md. at 580, 705 A.2d at 304. Subsequent to the hearing, the City Attorney had its appraisers evaluate the appraisal offered by Woodmont at the hearing and sent correspondence to the City in defense of the assessment proposed by the City. *Id.* With the City's permission, Woodmont responded to the new information presented by the City Attorney. *Id.* Despite the country club's efforts, the assessments were levied as proposed. Woodmont ultimately appealed to the Court of Special Appeals, which reversed the trial court on the rationale that Woodmont was entitled to an opportunity to cross-examine the City appraisers. *Woodmont Country Club*, 348 Md. at 580–81, 705 A.2d at 304–05. In affirming the intermediate appellate court's judgment, we found that, because the City Council had *"h[eld] a hearing, receiv[ed] written and oral testimony, and consider[ed] evidence to determine the specific amount of special benefit to a particular piece of property"* being assessed by the City, the Council had, in those acts, performed in a quasi-judicial capacity, thereby entitling Woodmont to an opportunity for cross-examination. *Woodmont Country Club*, 348 Md. at 585, 582, 705 A.2d at 307, 305 (emphasis added).

The *Armstrong III* court drew a favorable comparison between the fact-finding process in *Woodmont Country Club* and that which occurred in the hearing before the Land Use and Planning Committee of the Baltimore City Council in the conditional use case. 169 Md.App. at 670, 906 A.2d at 424. The court found that the testimony of several concerned community members, the questions of several Committee members directed to the developer regarding the parking lot's economic impact, and the Council's consideration of several "fact-intensive," site-specific factors distinguished the proceedings as quasi-judicial in nature, similar to those in *Woodmont Country Club. Id.*

Once the proceeding was determined to be quasi-judicial in nature, the court looked next to whether the action or decision complained of was a "zoning action" as that term is used in § 2.09. In this inquiry, the court examined precisely what decision or act by the governmental entity is the subject of the petition for judicial review. *Id.* at 677–78, 906 A.2d at 428. This step was necessary, in the court's view, to distinguish between cases where the thrust of the attack is directed at a legislative act not fitting within the term of "zoning action" and cases where the thrust of the attack is directed at a quasi-judicial act imputing a "zoning action." *Id.* Thus, *Armstrong III* concluded that a piecemeal application, initiated by the property owner for a specific conditional use for a specific property, is a "zoning action," while zoning text amendments or comprehensive rezonings initiated by government are not. *Id.* at 673–74, 906 A.2d at 425–26.

## B.

The approach taken in *Armstrong III* reflects an analysis recognized in our zoning law precedent. In *Stephans II*, we opined that the word "action" in the phrase "zoning action" was meant to be understood more in the sense of an adversarial proceeding involving a controversy between two or more parties, rather than a legislative action such as a comprehensive zoning plan or a text amendment to a zoning ordinance or regulation. 286 Md. at 390, 408 A.2d at 1019. The essential

point of this observation may be understood to distinguish an act by a legislative body that focuses on an individual property or assemblage of properties requiring particularized findings as to the circumstances of that property (or assemblage of properties) from acts that primarily have broader, community-wide implications which encompass considerations affecting an entire planning area or zoning district. Thus, when a legislative body considers a comprehensive area zoning or rezoning, the focus of its deliberations is not on a single parcel of land in a district or planning area, but rather on the entire district or area because it is the characteristics of the entire district that will inform the body's ultimate decision. By the same token, when a governmental body or agency undertakes the consideration of a proposal for a conditional use or a PUD, the body or agency necessarily concentrates its review and analysis on the parcel in question and the consequences of the proposed use of that parcel relative to the area more immediately surrounding the subject property.

In this way, the potentially "adversarial" type proceeding alluded to in *Stephans II* partakes of the characteristics previously discussed as indicative of a quasi-judicial, fact-finding process: the reception and weighing of facts to arrive at a conclusion, expressed as findings required by regulatory criteria, as to a specific land use proposal, initiated by the property owner or its representative, for a specific property or assemblage of properties.[15] The appellation of "quasi-judi-

---

15. An individualized, quasi-judicial proceeding may be "adversarial" in the sense that members of the surrounding community, as well as advisory governmental departments, are most likely to, and do, dispute the fitness for approval of these individualized land use proposals, usually in terms of how the proposal will affect adversely the use, value, and enjoyment of their land. *See, e.g., Armstrong II*, 390 Md. at 470, 889 A.2d at 400 (discussing a dispute between neighbor residents and a developer seeking a parking lot ordinance); *Sugarloaf Citizens Ass'n v. Dep't of the Env't*, 344 Md. 271, 297–99, 686 A.2d 605, 618–20 (1996) (cataloguing cases where adjoining land owners properly have been aggrieved, and holding specifically that a farm owner whose property was located approximately 2,000 feet from a proposed incinerator had standing to contest the permit to operate the incinerator); *Superior Outdoor Signs, Inc. v. Eller Media Co.*, 150 Md.App. 479, 500–01, 822

cial," however, when assigned to governmental processes and acts, is not talismanic for declaration of a "zoning action," obviating the need for further inquiry into whether the act in question is eligible for statutory judicial review. Rather, it simply denotes certain processes involved in an "action" as understood in Art. 66B, § 2.09(a)(1)(ii).

Although many relevant appellate cases refer to quasi-judicial decisions derived from pure administrative agencies, *see Consumer Prot. Div. v. Morgan*, 387 Md. 125, 160, 874 A.2d 919, 939 (2005), fundamentally legislative bodies, such as the Baltimore City Council, similarly may act in a quasi-judicial capacity. *Prince George's County v. Beretta U.S.A. Corp.*, 358 Md. 166, 175, 747 A.2d 647, 652 (2000). The principal characteristic of a quasi-judicial proceeding is that of fact-finding by the undertaking body, even if the relevant facts are undisputed. *Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530, 543, 723 A.2d 440, 446 (1999); *Bd. of License Comm'rs for Prince George's County v. Global Express Money Orders, Inc.*, 168 Md.App. 339, 345, 896 A.2d 432, 435 (2006). A determination of whether a particular governmental body is conducting a quasi-judicial inquiry must address "the nature of the particular act in which [the body] is engaged." *Woodmont Country Club*, 348 Md. at 585, 705 A.2d at 307. In the land use and zoning context, the essential questions to be asked are: what property or properties are being examined, for what reason, and at whose behest? As we have previously noted, proceedings or acts that scrutinize individual parcels or assemblages for the consideration of property-specific proposed uses, at the owner's or developer's initiative, ordinarily suggest a quasi-judicial process or act.

The case law of this State provides many exemplars of what have been found to be quasi-judicial proceedings. In general terms, we have said that quasi-judicial proceedings and acts are carried out largely by the exercise of discretion by a

A.2d 478, 490–91 (2003) (involving an complaint raised by one billboard company that a zoning act was giving a competitor with land abutting theirs a competitive advantage that harmed their business).

governmental body. *City of Bowie v. Prince George's County,* 384 Md. 413, 440, 863 A.2d 976, 991 (2004). That discretion is exercised through the holding of hearings by the body, *Union Investors, Inc. v. Montgomery County,* 244 Md. 585, 588, 224 A.2d 453, 454 (1966), which then is tasked with "rendering findings of fact and making conclusions of law. . . ." *Chestnut Real Estate P'ship v. Huber,* 148 Md.App. 190, 199, 811 A.2d 389, 394 (2002). The mode of fact-finding and particular formalities observed in the process can vary depending on the nature of the matter being considered by the hearing body. *See Hyson v. Montgomery County Council,* 242 Md. 55, 67, 217 A.2d 578, 586 (1966) (holding that at least some right to cross-examination exists in Montgomery County zoning reclassification public hearings). *But see Woodward & Lothrop, Inc.,* 280 Md. at 713, 376 A.2d at 498 (holding that no right to cross-examination exists for sectional map amendments involving comprehensive rezoning in Montgomery County, a legislative in nature process). *See also Gorin v. Board of Co. Comm'rs for Anne Arundel County,* 244 Md. 106, 110, 223 A.2d 237, 239 (1966) ("While proceedings before an administrative board are informal and the strict rules of evidence do not apply, when the board is functioning in an adversary proceeding, the fundamentals applicable to the decision of adjudicative facts by any tribunal must be preserved.").

We note that the fact-finding process for piecemeal land use and zoning matters usually entails at least the holding of a hearing, the receipt of factual and opinion testimony and forms of documentary evidence, and a particularized conclusion as to the development proposal for the parcel in question. *See Woodmont Country Club,* 348 Md. at 585, 705 A.2d at 307; *see also Maryland–National Capital Park and Planning Comm'n. v. Friendship Heights,* 57 Md.App. 69, 82, 468 A.2d 1353,1359 (1984) ("Where . . . the administrative tribunal is under a duty to consider evidence and apply law to the facts as found, thereby exercising some discretion, the function is quasi-judicial."). It is primarily the emphasis that the hearing places on a particular property and the unique considerations of its proposed development that tender to

render it quasi-judicial in nature. This emphasis is only natural. "Zoning matters ... depend upon the unique facts and circumstances of a particular location and must be analyzed individually." *Red Roof Inns, Inc. v. People's Counsel for Baltimore County,* 96 Md.App. 219, 227–28, 624 A.2d 1281, 1285 (1993).

In *Woodmont Country Club,* we referred on multiple occasions to the focusing of a proceeding on an individualized parcel of land as important in finding that the process was a quasi-judicial one. 348 Md. 572, 583–84, 705 A.2d 301, 306. The *Woodmont Country Club* Court also noted its opinion in *Hyson,* where we found that the Montgomery County Council, in "considering and determining [ ] adjudicative facts concerning particular parties [in a zoning reclassification matter], [ ] necessarily was performing a quasi-judicial function, even though its final action, in granting or denying the reclassification which was required to be based upon its findings of adjudicative facts, was quasi-legislative in character." 242 Md. at 65, 217 A.2d at 584, *cited in Woodmont Country Club,* 348 Md. at 584, 705 A.2d at 306–07. We later clarified in *Bucktail* that it is not a hearing's mere focus on one parcel that is dispositive of its quasi-judicial nature, but rather that the matter taken up at the hearing is disposed of based on the unique characteristics that inhere to that parcel when considering the proposed use. 352 Md. at 545, 723 A.2d at 447 ("This determination is not based on whether the zoning decision adversely affects an individual piece of property, but whether the decision itself is made on *individual or general grounds."*) (emphasis added).

Yet another of our cases demonstrates the relationship between an individualized determination and a quasi-judicial process or act. *Mossburg v. Montgomery County,* decided in 1993, involved a petition for a special exception (conditional use) to build a solid waste transfer station in Montgomery County. The County Board of Appeals denied the application for the exception after a hearing at which extensive testimony was offered by concerned citizens opposed to it. 329 Md. at 496–98, 620 A.2d at 887–88. We held, in part, that the Board

of Appeals's proceeding was quasi-judicial in the sense that it evaluated "[a]n application for a special exception involv[ing] a particular applicant's request for administrative authorization to engage in a *specific activity at a specific location.*" *Mossburg,* 329 Md. at 506, 620 A.2d at 892 (emphasis added).

It is only by looking to the particular circumstances of an affected parcel and its immediate environs that a body can make the necessary findings and conclusions called for by statute, ordinance, or regulation. These site-specific findings of fact are necessary not only to inform properly the interested parties of the grounds for the body's decision, *Mehrling v. Nationwide Ins. Co.,* 371 Md. 40, 64, 806 A.2d 662, 676 (2002) (citing *Blue Bird Cab Co. v. Md. Dep't of Employment Sec.,* 251 Md. 458, 466, 248 A.2d 331, 335 (1968)) (noting that "a fundamental requirement of the due process of law in a quasi-judicial proceeding is the right of the parties to be apprised of the facts relied upon by the tribunal in its decision."), but also to provide a basis upon which judicial review may be rendered. *Pattey v. Bd. of County Comm'rs for Worcester County,* 271 Md. 352, 359–60, 317 A.2d 142, 146 (1974) (restraining judicial review of a legislative body's zoning decision to the record); *Bd. of County Comm'rs for Prince George's County v. Ziegler,* 244 Md. 224, 229, 223 A.2d 255, 257 (1966) ("[I]t is clear that without a record of the facts on which the zoning authority acted or a statement of the reasons for its action, the reviewing court could not properly perform the duty it had of determining whether the action of the zoning authority was arbitrary or capricious.").

## C.

The Baltimore City Council's consideration of the PUD amendment proposal advanced by Canton Crossing, which later became the subject of Ordinance 04–873, was evaluated on both individual and general grounds. It is clear from the record that the Council's decisions to grant both Canton Crossing's original request to designate its 67 and one-half acre plot of land as an Industrial PUD and each of the three subsequent substantive amendments to the approved PUD

were made upon grounds focused on a development plan for that plot of land only, and thus was considered on an individualized basis. This property alone was singled out for proposed amendment of its zoning, rather than the entire zoning district or planning area in which it is located. This individualized action was precisely the kind of change, focusing on the particulars involved with a specific property and its unique circumstances, contemplated by our previous cases as quasi-judicial in nature. *See Bucktail,* 352 Md. at 545, 723 A.2d at 447; *Woodmont Country Club,* 348 Md. at 583–84, 705 A.2d at 306; *Mossburg,* 329 Md. at 506, 620 A.2d at 892; *Hyson,* 242 Md. at 65, 217 A.2d at 584.

We turn to the quality of the proceeding employed to examine the PUD amendment proposal. The Maryland Code and the Baltimore City Zoning Code both set forth a requirement that some form of hearing be held in conjunction with zoning acts carried out by the City Council. Md.Code, Art. 66B, §§ 2.05(d), 2.04(b) (providing for public hearings designed to grant "parties in interest and citizens [ ] an opportunity to be heard."); Baltimore, Md., Zoning Code §§ 16–402(a)(1); 16–101(d)[16] (mandating that a committee of the Council considering a bill that would change the zoning classification of a property, create a conditional use, or grant a PUD permit interested parties and the public an "opportunity to be heard").

Both codes also require certain findings of fact be made and governing standards be applied to those facts. The Maryland Code generally requires the Council[17] to make findings of fact regarding the zoning proposal that include: population changes, availability of public facilities, present and future

---

16. There appears to be a typographical error in the ordering of the subsections of § 16–101. This error, created by the addition of a new subsection (c) in the past year, has produced two subsections designated as (c). The second (c), which should be a(d), is the subsection to which we refer here.

17. The Council has the option, by virtue of § 2.06(a) of Art. 66B, to appoint a hearing examiner to fulfill this fact-finding role.

transportation patterns, compatibility with existing and pro-
posed development for the area, the recommendations of the
Planning Commission and the Board of Municipal and Zoning
Appeals, and the relation of the act to the City's plan. Md.
Code Art. 66B, § 2.05(a)(2). The Baltimore City Zoning Code
is much more specific in the findings and criteria applicable to
the grant of a PUD proposal. In addition to the standards set
for the grant of a conditional use, Baltimore, Md., Zoning
Code § 14–205(a) (listing 14 separate criteria), a PUD is
subject to scrutiny on ten additional points of consideration
respecting the physical features of the land, health and safety
of residents, as well as use and bulk regulations.[18] The council

---

**18.** § 9–112. Governing standards
 In reviewing the proposal, the agencies to which a bill is referred
 must consider:

 * * *

 (b) in addition, whether:
 (i) the plans for the Planned Unit Development are in general con-
 formance with:
 (A) all elements of the Master Plan; and
 (B) the character and nature of existing and contemplated develop-
 ment in the vicinity of the proposed Planned Unit Development;
 (ii) the Planned Unit Development will preserve unusual topographic
 or natural features of the land;
 (iii) the design of the Planned Unit Development will best utilize and
 be compatible with the topography of the land;
 (iv) the physical characteristics of the Planned Unit Development will
 adversely affect:
 (A) future development or the value of undeveloped neighboring
 areas; or
 (B) the use, maintenance, or value of neighboring areas already
 developed;
 (v) with respect to availability of light, air, open space, and street
 access, the Planned Unit Development will secure for its residents
 and neighboring residents substantially the same benefits as would be
 provided by application of the basic district regulations;
 (vi) with respect to fire, health hazards, and other dangers, the
 Planned Unit Development will secure for its residents and neighbor-
 ing residents substantially the same protection as would be provided
 by application of the basic district regulations; and
 (vii) the Planned Unit Development will permit design features that
 would not be possible by application of the basic district regulations.
 (b) *Use regulations.*
 The uses that would be allowed under this title but not under the
 basic regulations governing the underlying district in which they are
 located:

bill that called for the amendment of Canton Crossing's development plan was subject to analysis in reports by the City Solicitor, Board of Municipal and Zoning Appeals, Planning Commission, Department of Housing and Community Development, Department of Public Works, Fire Department, Parking Authority Board, and Transportation Department, which served as the source for many of the conditions attached ultimately to approval of the amendment. Following that, the Land Use and Planning Committee of the City Council scheduled and held a duly advertised public hearing on the bill on 3 November 2004, which was reported as favorable with amendments by the Committee. At that audio-taped hearing, the Committee heard testimony from the developer and members of the public regarding a number of topics concerning the PUD and its putative effects on the community. The Hearing Notes indicate that the focus of the hearing was on the potential problems of increased noise, traffic, encroachment into the industrial district, and obstruction of water views from a nearby park. Canton Crossing and the City also apparently agreed to negotiate the massing for a cruise ship terminal should one be approved by the State.

It should also be noted that concurrent with this hearing and referral process, the Council examined, and ultimately approved, the development plan, which is required to address thirteen separate considerations affecting the site of the proposed PUD or any substantive amendment to an approved PUD. Baltimore, Md., Zoning Code §§ 9–107, 9–110; *see also supra* at 28–29, 909 A.2d at 242. The gravamen of these

---

(1) must be necessary or desirable for and appropriate to the primary purpose of the Planned Unit Development; and
(2) may not be of a nature, or so located, as to adversely affect the surrounding neighborhood.
(c) *Bulk regulations.*
The application of bulk regulations under this title, which are expressed in terms of overall density for the entire Planned Unit Development rather than on a lot-by-lot basis, should result in overall development that is no less beneficial to the residents than would be obtained by application of the basic regulations for the underlying district.

standards and the inquiry surrounding them is a detailed and thorough examination of the unique circumstances of a specific PUD proposal for a specific parcel, including the potential for adverse impacts on adjacent properties. This process of receiving evidence and creating a record upon which the City Council then must rely in deciding the ultimate question of whether the development plan, or amended plan, should be granted is quite analogous to the quasi-judicial processes analyzed in *Woodmont Country Club* and *Mossburg.* In both of those cases, as was done here, findings of fact were made based on reports from governmental agencies and departments and a public hearing, wherefrom the final governmental decision-maker drew its findings as to the pending matter affecting a particular piece of property. *City of Bowie,* 384 Md. at 440, 863 A.2d at 991. We are satisfied that the process for the approval of PUDs, and substantive amendments thereto, in Baltimore City is of sufficient quasi-judicial character, rather than legislative in nature, to examine the ultimate question of whether the Council's approval of the PUD amendment embodied by Ordinance 04–873 qualifies as a "zoning action" and therefore is subject to a petition for judicial review.

## IV.

To understand the scope of § 2.09(a)(1)(ii) and its key phrase "zoning action,"we remind ourselves of what was said in *Stephans II.* The crucial legislative history of § 2.09 and *Stephans II* are well explicated in *MBC Realty:*

> Article 66B was enacted in 1933. The statute provided for judicial review only from decisions by a Board and then only on writ of certiorari. *Board of County Commissioners of Carroll County v. Stephans,* 286 Md. 384, 391, 408 A.2d 1017 (1979). In 1962, the statute was amended to provide for judicial review of a decision by a Board, without the certiorari requirement. *Id.* at 392, 408 A.2d 1017.

> Consequently, after the 1962 amendment, there was a statutory right of judicial review, as an administrative appeal, from a decision by a Board. There was no such right with respect to a decision by the local legislative body.

With respect to decisions by a legislative body, a party had to file an action invoking the general jurisdiction of a court, arguing whatever theories were available under separation of powers principles, essentially that the legislation was unconstitutional or ultra vires. "The test of invalidity of a zoning ordinance is whether it is arbitrary, unreasonable and discriminatory, and has no substantial relation to the public health, safety, morals, or general welfare."

In 1970, §§ 2.09 and 4.08 [19] were amended to permit an administrative appeal from "a reclassification by the local legislative body," in addition to an administrative appeal from a decision by a Board. *Stephans*, 286 Md. at 392, 408 A.2d 1017. The right of review was pursuant to chapter 1100, subtitle B of the Maryland Rules. *Id.* (forerunner to title 7, chapter 200). The amendment was recommended by the Maryland Planning and Zoning Law Study Commission. The Commission explained,

> This section is unchanged except for the inclusion of an appeal process from reclassification decisions of the local legislative body. It can be argued that under the present system appeals from reclassification decisions may be launched in equity at any time. This has proven to be a detrimental factor to most persons concerned with such an action. The appeal process to be used, Chapter 1100, Subtitle B, Maryland Rules, requires noting of an appeal within thirty days and filing of the appeal within another ten days. This is ample time to bring an appeal for review (*i.e.* if a person is aggrieved by a decision it is incumbent upon him to react within a reasonable period of time).

*Id.* at 393, 408 A.2d 1017.

In 1975, the statute was amended and, in relevant part, in sections 2.09 and 4.08, substituted "zoning action" for "re-

---

**19.** Section 4.08 applies to appeals in non-charter counties and municipalities, while section 2.09 applies to appeals in Baltimore City. *Bucktail*, 352 Md. at 549, 723 A.2d at 449; *Cmte. for Responsible Dev. on 25th Street v. Mayor and City Council of Baltimore*, 137 Md.App. 60, 81–82, 767 A.2d 906, 917 (2001).

classification by the local legislative body." *Id.* The Court of Appeals, after reviewing the legislative history of the judicial review provisions in section 4.08 and relying specifically on language in the title to the amendment, concluded that the change to "zoning action" was stylistic and not substantive. *Id.* at 397, 408 A.2d 1017.

In *Stephans,* the County Commissioners of Carroll County approved the following matters as recommended by the Carroll County Planning and Zoning Commission: (1) adopted a comprehensive "mini" plan for the Freedom area of Carroll County; (2) added a new section to the county zoning ordinance providing for a "R–40,000 Residence District[;]" (3) changed the standards for approval of subdivisions; (4) provided for schools and colleges as a principal permitted use in a conservation zone; (5) specified that department stores be a permitted use in a local business district; and (6) comprehensively rezoned the Freedom area. *Stephans,* 286 Md. at 386, 408 A.2d 1017.

Landowners objected to the actions and sought judicial review pursuant to the provisions of section 4.08. The Court held that neither the adoption of the plan nor the amendment of the zoning text was a "zoning action." The Court stated that "zoning action" in section 4.08 meant " 'a reclassification by the local legislative body,' referring to piecemeal or 'spot' zoning, not to comprehensive zoning or rezoning." *Id.* The Court further explained that "[c]hallenges in the courts to the adoption of comprehensive plans, zoning texts, and zoning text amendments must come in proceedings other than administrative appeals." *Id.*

As we have observed previously, to the extent relevant here, sections 2.09 and 4.08 are the same. Consequently, the holding in *Stephans* applies to section 2.09, as well as section 4.08.

160 Md.App. 376, 383–85, 864 A.2d 218, 222–23 (certain citations omitted).

In *MBC Realty,* the Court of Special Appeals was confronted with determining the propriety of a petition for judicial

review, filed under § 2.09, in response to the passage of three ordinances by the Baltimore City Council which, taken together, allowed for the placement of new billboards, as conditional uses subject to certain express conditions, on the exterior of the 1st Mariner Arena in downtown Baltimore. 160 Md.App. at 381, 864 A.2d at 221. The intermediate appellate court affirmed the Circuit Court's dismissal of the petition on the rationale that the granting of the conditional use was not a "zoning action." *MBC Realty,* 160 Md.App. at 380, 864 A.2d at 220. In addition, the court held that the two ordinances that preceded the ordinance granting the actual conditional use for the signs on the Arena were text amendments to the zoning regulations, ineligible under *Stephans II* for judicial review as zoning actions. *MBC Realty,* 160 Md.App. at 389, 864 A.2d at 225. Whether, in light of its new analytical approach advanced in *Armstrong III*, the Court of Special Appeals would reach the same result today as it did in *MBC Realty,* at least as to the ordinance granting the specific conditional use, seems doubtful.

 A closer review of the legislative history behind § 2.09 than was undertaken in *Stephans II,* a disciplined application of the principles of statutory construction, and certain relevant policy considerations counsel us to gainsay here *Stephans II's* narrow interpretation of the phrase "zoning action." We start, as our well-established rules of statutory construction direct us, with the plain language of the statute where the "ordinary, popular understanding of the English language dictates interpretation of its terminology." *Kushell v. Dep't of Natural Res.,* 385 Md. 563, 576, 870 A.2d 186, 193 (2005) (citing *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484, 487 (2004)). Our construction of that language is guided also by a number of other established canons of interpretation:

"[a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application." Statutory text " 'should be read so that no

word, clause, sentence or phrase is rendered superfluous or nugatory.'" The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect.

If statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written. "If there is no ambiguity in that language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends; we do not need to resort to the various, and sometimes inconsistent, external rules of construction, for 'the Legislature is presumed to have meant what it said and said what it meant.'"

*Kushell,* 385 Md. at 576–77, 870 A.2d at 194 (internal citations omitted).

The meaning of the word "zoning," as discussed in *Stephans II,* as far as it went, retains some vitality today. In general terms, the term "zoning" is "used to describe the process of setting aside disconnected tracts of land varying in shape and dimensions, and dedicating them to particular uses designed in some degree to serve the interests of the whole territory affected by the plan." *Stephans II,* 286 Md. at 388–89, 408 A.2d at 1019 (quoting *Applestein v. Osborne,* 156 Md. 40, 51, 143 A. 666, 671 (1928)). In as much as the types of zoning mechanisms principally relied on in 1979 and earlier to effect land development were largely Euclidean in nature, that this understanding prevailed at that time is understandable. Our decision in *Rylyns,* however, provides a somewhat more inclusive explanation of the nature of zoning, taking into account more modern and flexible types of zoning tools, and which distinguishes the more short-term regulation of land from the forward-looking concept known as planning:

Zoning, in theory, is the process whereby the comprehensive plan is put into effect. The local legislative body that makes zoning decisions divides districts within the locality

into zones, and the legislative body defines, *inter alia*, the height, building size, lot size, population density, location, and use of buildings that are permissible in the particular zone.

372 Md. at 529–30 & n. 5, 814 A.2d at 477–78 & n. 5.

The more difficult inquiry is divining the meaning of "action" as it is used in § 2.09(a)(1)(ii). As previously discussed, the *Stephans II* Court viewed this term in its "legal sense" as indicative of an adversarial proceeding wherein opposing parties settle a controversy in some form of tribunal. 286 Md. at 390, 408 A.2d at 1019. We suggest here that such a conception of "action" is too cramped. The plain meaning of the term should be considered in its ordinary, popular understanding in the English language, rather than in a strictly "legal sense." *Id.* As such, we view "action" in a slightly broader sense than *Stephans II* did; one that embodies a less technical meaning tied exclusively to legal jargon. One respected dictionary extant at the time the General Assembly amended § 2.09(a)(1)(ii) to replace "reclassification" with "zoning action," first defines "action" as a "deliberative or authorized procedure." Webster's Third New International Dictionary 21 (1966). It, and another dictionary contemporaneous with the adoption of the statute in question,[20] then provide more generic definitions which allude to action as the act of doing something or performing a deed. *Id.* ("[A] thing done; deed"); Black's Law Dictionary 26 (5th ed. 1979) ("[C]onduct; behavior; something done; the condition of acting . . ."). More recent dictionaries have concurred in this more general understanding of the word "action." *See, e.g.,* Black's Law Dictionary 21 (8th ed. 1999) ("[T]he process of doing something; conduct or behavior; an act or thing done; act. . . ."); The Compact Oxford English Dictionary 15 (2d ed. 1991) ("[A]

---

20. We have pointed out that when courts find it prudent, in defining terms in the quest for understanding of statutory intent, to resort to dictionaries, it is advisable to make reference first to those dictionaries that were contemporaneous at the time the statutory language at issue was created. *Harvey v. Marshall*, 389 Md. 243, 260, n. 11, 884 A.2d 1171, 1181 n. 11 (2005).

doing; performance"); Webster's New Universal Unabridged Dictionary 20 (2d ed. 1983) ("[T]he doing of something; ... an act or thing done").

■ Taken together, these more commonly held understandings of the constituent parts of the phrase "zoning action" point to a meaning that has a broader sense than merely a "reclassification." Instead, we view "zoning action" in § 2.09 as any act by the Mayor and City Council that (1) decides the use of a specific parcel or assemblage of parcels of land, (2) was initiated by an individual application by a property owner or its representative, (3) was based on fact-finding (from a record containing evidence, usually both pro and *con*) adduced through governmental agency analysis of the proposal and through a public hearing, and (4) either creates or modifies substantively the governing zoning classification or defines the permissible uses, building and lot sizes, population density, topographical and physical features, and other characteristics of a specific parcel or assemblage of parcels of land by exercising some discretionary judgment after the consideration of the unique circumstances of the affected parcels and buildings.[21] This framework further explains why amendments to the text of zoning regulations, comprehensive zonings, and other acts that are legislative in nature do not qualify for judicial review under § 2.09.

---

**21.** This definition is very similar to that crafted by the Court of Special Appeals in *Stephans I*:

> [G]iving the particular words involved here 'zoning action' their natural and ordinary signification, the Legislature intended the phrase to encompass any act or deed of the local legislative body that controls or directs the use of land and buildings by dividing the governmental area into use districts according to present and planned future conditions. We find no ambiguity or obscurity in this language and therefore need not look elsewhere to ascertain the intent of the Legislature.

41 Md.App. 494, 500, 397 A.2d 289, 292 (1979) (citation omitted), *rev'd*, 286 Md. 384, 408 A.2d 1017. The intermediate appellate court later referred to this conception of the term "zoning action" as a valid one and construed the term as primarily dealing with use regulation, focusing on specific properties. *Gregory*, 89 Md.App. at 639–41 599 A.2d at 471–72.

### B.

Because of the more commonly held understanding of the term "zoning action" adopted in this opinion, we must re-visit the conclusion reached by the *Stephans II* Court that the General Assembly's change of the language of § 2.09 from "reclassification" to "zoning action" was merely stylistic. 286 Md. at 396, 408 A.2d at 1022–23. The *Stephans II* Court inferred from the fact that the two main purposes of the 1975 enactment delineated in the title of the act arguably did not mention or concern the change from "reclassification" to "zoning action" that the change in language must have been one of the purely stylistic changes alluded to generally in the title. *Id.*

Modern cases look beyond the facial statements in Revisor's notes or inferential reasoning concluding that changes in statutory language were merely stylistic. Those cases apply plain meaning analysis to determine if the change, nonetheless, effected a clearly substantive change. *Md. Div. of Labor and Indus. v. Triangle Gen'l Contractors*, 366 Md. 407, 419–20, 784 A.2d 534, 541 (2001) (holding the addition of certain language to be substantive despite numerous legislative references to changes occurring in a re-codification as being purely stylistic); *Abramson v. Montgomery County*, 328 Md. 721, 737, 616 A.2d 894, 901–02 (1992) (finding that, contrary to the Revisor's note, the substitution of "person" for "party" worked a substantive change in determining whether a governmental entity is considered a "person" for purposes of the exhaustion of administrative remedies requirement for an appeal to Tax Court); *In re Taylor*, 312 Md. 58, 68–70, 537 A.2d 1179, 1184–85 (1988) (concluding that the deletion of certain language from the tools-of-the-trade bankruptcy exemption statute, although as a result of a recodification, must have been substantive although such changes during recodification are presumed to be stylistic); *Bd. of Supervisors of Elections of Baltimore City v. Weiss*, 217 Md. 133, 138, 141 A.2d 734, 737 (1958) (finding a substantive change in language because the law was under five years of study and could not reasonably have unintended changes); *see also Mid–Atlantic Power Supply*

*Ass'n v. Public Serv. Comm'n of Md.,* 361 Md. 196, 760 A.2d 1087 (2000).

Thus, even if we were to accept the "logical inference" made by the *Stephans II* Court that the change from "reclassification" to "zoning action," in fact, was intended facially as a stylistic change, the inquiry does not end if the change in fact or law worked a substantive change. Thus, our application of the plain meaning rule here resolves differently than *Stephans II* the meaning of "zoning action." *Arundel Corp. v. Marie,* 383 Md. 489, 502, 860 A.2d 886, 894 (2004) ("If there is no ambiguity in that language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends; we do not need to resort to the various, and sometimes inconsistent, external rules of construction, for 'the Legislature is presumed to have meant what it said and said what it meant.' " (quoting *Witte v. Azarian,* 369 Md. 518, 525, 801 A.2d 160, 165 (2002))); *Triangle Gen'l Contractors,* 366 Md. at 423, 784 A.2d at 543 ("When a statute's language is clear and unambiguous, however, we need look no further for some hidden legislative intent." (quoting *Abramson,* 328 Md. at 736, 616 A.2d at 901)); *Tidewater/Havre de Grace, Inc. v. Mayor & City Council of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995) ("It is well-settled that when the meaning of a statute—its legislative intent—is at issue, the court's inquiry begins with the words of the statute, and ordinarily, also ends there."). Our reading of "zoning action" does not produce any absurdities or defeat the purpose of the 1975 statute. *See Tidewater/Havre de Grace, Inc.,* 337 Md. at 345, 653 A.2d at 472. Rather, it gives effect to the law by providing judicial review of specific reclassifications, which was the case prior to the language change, in addition to other acts by the City Council affecting the zoning of individual parcels of property. Moreover, the grant of authority in the 1975 law to the City Council to "provide for appeal to the Baltimore City Court of any matter arising under the planning and zoning laws of the City of Baltimore," [22] is not rendered mere surplusage by our broader

---

22. Laws of Maryland of 1975, ch. 267, § 3 (codified as Art. 66B, § 2.09(f)).

reading of "zoning action." *Moore v. State,* 388 Md. 446, 453, 879 A.2d 1111, 1115 (2005).

## C.

To summarize, the pertinent criteria for determining whether a particular action by the Mayor and City Council is a "zoning action" are: first, there must be a determination that the process observed by the governmental body in affecting an alleged zoning action was quasi-judicial in nature, rather than legislative. A quasi-judicial proceeding in the zoning context is found where, at a minimum, there is a fact-finding process that entails the holding of a hearing, the receipt of factual and opinion testimony and/or forms of documentary evidence, and a particularized conclusion, based upon delineated statutory standards, for the unique development proposal for the specific parcel or assemblage of land in question. Second, if the governmental act in question involves a quasi-judicial process, the inquiry moves to the question of whether it qualifies as a "zoning action." Where the City Council exercises its discretion in deciding the permissible uses and other characteristics of a specific parcel or assemblage of land upon a deliberation of the unique circumstances of the affected land and its surrounding environs, a "zoning action" is the result.

In the case at hand, Ordinance 04–873 was enacted as the result of a quasi-judicial process. It approved the "increase [of] the number of residential dwelling units permitted and [modified] the uses and buildings permitted and their locations and size." *See op., supra* at 24, 909 A.2d at 239–40. The prevailing purpose of the Ordinance, then, was to define the permissible uses, if not also to modify to some degree the zoning classification, of the specific parcel. The amendment sought by the property owner proposed "to increase the number of residential dwelling units from 100 to 504; to decrease the amount of office space from 1.7 million to 1.5 million square feet; to decrease the amount of retail space from 450,000 to 150,000 square feet; and to increase the

amount of restaurant space from 50,000 to 120,000 square feet." *Id.* & n. 8. The City Council's deliberative consideration, after receiving evidence at a required hearing, and approval of these specific uses for this specific parcel after making required statutory findings falls within the realm of a "zoning action." We, therefore, hold that Maryland Overpak was entitled to seek judicial review of the adoption of Ordinance 04–873 as a "zoning action" under § 2.09(a)(1)(ii).

## V.

Because our holding is that Ordinance 04–873 granting an amendment to a PUD qualifies as a "zoning action" capable of judicial scrutiny in a petition for judicial review process, we need not consider Appellant's argument that its proceeding brought in the Circuit Court was proper if viewed as a legal modality of judicial process other than a petition for judicial review.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.